**P., by and through his parents and next friends, MR. and Mrs. P., Plaintiff,**

v.

**NEWINGTON BOARD OF EDUCATION, Defendants.**

**Civ. No. 3:06CV009 (AWT).**

United States District Court, D. Connecticut.

Sept. 28, 2007.

David C. Shaw, Law Offices of David C. Shaw, Bloomfield, CT, for Plaintiff.

Mark J. Sommaruga, Sullivan, Schoen, Campane & Connon, Hartford, CT, for Defendants.

*RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT*

ALVIN W. THOMPSON, District Judge.

The plaintiff ("P.") is an intellectually disabled child who attends the Newington public schools. P.'s parents ("Mr. and Mrs. P."), acting as his next friends, brought this action against the Newington Board of Education (the "Board") seeking relief under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* (the "IDEA" or the "Act").[1] Specifically, the plaintiff challenges the finding by an administrative hearing officer that the Board's proposed program for P. for the 2005–2006 school year satisfied the requirements of the IDEA. The plaintiff also seeks an award of attorney's fees and costs under 20 U.S.C. § 1415(i)(3).

The parties have filed cross-motions for summary judgment. The court concludes that the hearing officer did not err in finding that the Board's program for P. for the 2005–2006 school year was appropriate and that the Board considered placing P. in regular classes and removing him only when he could not be educated satisfactorily with supplementary aids, supports, and modifications during the 2005–2006 school year, as required by 20 U.S.C. § 1412(a)(5)(A). Accordingly, the Board's motion for summary judgment is being granted, and P.'s motion for summary judgment is being denied. However, because the plaintiff achieved partial success at the administrative hearing on some significant issues that were not raised on appeal to this court, the Board will be required to reimburse P. for attorneys' fees and costs in an amount commensurate with the plaintiff's success.

**I. FACTUAL BACKGROUND**

P. was born on April 23, 1996 with a variety of medical problems that necessitated multiple surgeries before the age of three. He suffers from Down's syndrome, Hirschprung's disease, an intellectual disability, and a mild hearing impairment. In addition, P. experiences substantial behavior problems and has difficulty communicating effectively. As a result of developmental delays, P. has required intensive intervention since birth, including occupational, physical, speech, and language therapy. P. benefits from such services as part of his educational program. He also receives assistance from two paraprofessionals in addition to working with his regular classroom and special education teachers.

In the spring of 2004, the school district's behavioral consultant, Greg Smith, informed P.'s parents that it would become increasingly difficult to mainstream their child into a regular classroom as the gap in ability between P. and his peers grew wider. P.'s mother strongly disagreed with the views expressed by Smith. On May 28, 2004, towards the end of P.'s first grade year, the student's Planning Placement Team ("PPT") met to discuss the student's goals and objectives for the coming year. The parents wanted P. to be placed in a regular classroom for at least 80% of the school day and asked the Board to hire a consultant to support the student's program. In accordance with the parents' request, the Board retained Dr. Kathleen Whitbread in July 2004.

P.'s individualized education program (IEP) for the 2004–2005 school year pro-

---

1. The Act was amended by the Individuals with Disabilities Education Improvement Act of 2004, Pub.L. No. 108–446, 118 Stat. 2647 (Dec. 3, 2004), which took effect on July 1, 2005. The administrative hearing in this case did not occur until after the effective date of these amendments.

vided that he would spend approximately 19.5 hours per week with non-disabled students and that he would receive occasional instruction in an alternate setting to increase his attention and focus. The IEP also recommended "pull-out" services for occupational therapy and speech therapy. P. received physical therapy in an adaptive physical education class with other disabled children, although this was apparently labeled as a regular education service.

In the summer of 2004, P. was referred to the Connecticut Children's Medical Center (the "CCMC") for an evaluation. However, the psychologist at CCMC was unable to complete the cognitive testing because of the student's lack of focus. The CCMC report dated October 10, 2004 recommended a functional behavior assessment ("FBA") in order to determine the child's motivations for engaging in certain conduct. In the fall of 2004, the Board learned that the CCMC had not conducted the assistive technology evaluation ("ATE") that had been requested, but the child's parents asked that the evaluation be held off until the completion of the report by the inclusion consultant, Dr. Whitbread.

Dr. Whitbread's report, based on her observations of the student and interviews with the staff and parents, was completed on December 13, 2004. Whitbread concluded that the child's 2004–2005 IEP was inadequate because of its overly functional focus and pessimistic outlook. Whitbread recommended that an FBA and an ATE be conducted. She believed that the child would receive substantial benefits from greater participation in the regular education curriculum, although she acknowledged that some pull-out services were appropriate, especially for literacy instruction and speech therapy. A PPT was convened on February 11, 2005 to review the report prepared by Dr. Whitbread. (*Id.* at 13; B–66). At this meeting, the parents reiterated their view, consistent with Dr. Whitbread's recommendation, that the child's program should be more academically-focused. Also, consistent with Whitbread's report, the PPT recommended that an ATE be conducted for the child at Southern Connecticut State University.

The PPT met again on April 15, 2005 for the child's annual review and discussion of the IEP prepared for the 2005–2006 school year. The PPT decided that both an FBA and an ATE would be completed promptly. With regard to the IEP, Dr. Whitbread again stated that the expectations it set for P. were too low and that the school district should work toward the goal of including the child in a regular classroom for 80% of the school day. Although the child's inclusion rate for 2004–2005 was approximately 60%, the 2005–2006 IEP proposed increasing it to 74%, for a total of 23.75 hours per week spent with his non-disabled peers. The proposal stated that the student would participate in all regular education activities with adult assistance unless he was receiving individual instruction in the related services room to improve his focus or he was removed due to fatigue or inappropriate behavior. In addition, the IEP outlined many supports and aids the child would receive in the regular classroom as well as modifications to the general curriculum. As of the June 3, 2005 PPT, the parents remained dissatisfied with the amount of time their child was spending in the regular classroom. The PPT agreed that a mutually agreeable consultant would be hired for work in the fall because Dr. Whitbread's contract had expired.

On June 9, 2005, P.'s parents requested an administrative hearing to challenge the appropriateness of P.'s program for the 2004–2005 and 2005–2006 school years. The plaintiffs in this litigation presented

testimony from Mrs. P and Dr. Whitbread regarding the benefits of inclusion for P. and the school district's failure to provide certain modifications and supports that would have enabled P. to participate more fully in the regular education curriculum. (*Id.*). The Board offered the testimony of several school officials, including the child's teachers and therapists, in an effort to show the efforts made by the Board to accommodate P. in a regular classroom to the maximum extent possible given his need for occasional pull-out services.

The parties submitted the following five issues for resolution by the hearing officer: (1) whether the Board's program for the student for the 2004–2005 year was appropriate; (2) whether the Board's proposed program for the student for the 2005–2006 school year was appropriate; (3) whether during the 2004–2005 school year the Board placed the student in regular classes and removed him from that environment only when he could not be educated satisfactorily in regular classes with supplementary aids and supports and modifications to the general curriculum as required by 20 U.S.C. § 1412(a)(5)(A); (4) whether during the 2005–2006 school year the Board considered placing the student in regular classes and removing him from that environment only when he could not be educated satisfactorily in regular classes with supplementary aids and supports and modifications to the general curriculum as required by 20 U.S.C. § 1412(a)(5)(A); and (5) whether the hearing officer could override the parents' refusal to consent to a psychiatric evaluation, consultation and observation by a teacher of the hearing impaired and a mutually agreeable consultant who has experience and expertise as a behavioral specialist.

The hearing officer found in favor of the plaintiffs on the first, third, and fifth issues, and found in favor the defendants on the second and fourth issues. The hearing officer's conclusion that the Board's program and actions for the 2004–2005 year were not appropriate was based on the school district's inability to properly address the student's behavior problems and its failure to give sufficient consideration to mainstreaming the student for more than 60% of the week. However, the hearing officer found that the 2005–2006 IEP provided appropriate modifications and adaptations to enable the student to participate in the regular education environment to the maximum extent appropriate. On the final issue, the hearing officer concluded that the Board's view that a psychiatric evaluation was justified as a means of providing greater information about the student was an insufficient basis to require the evaluation in the absence of the parents' consent. The hearing officer ordered the Board to provide compensatory education with respect to the 2004–2005 school year and to retain an inclusion consultant, other than Dr. Whitbread, who had considerable experience placing children with mental retardation in a regular classroom setting.

As of the final PPT meeting noted in the record, which was held on August 8, 2005, the Board had hired Dr. Ann Majure, who was on the parents' list of approved inclusion specialists, as an inclusion and behavior consultant. Moreover, P. was being included in a regular education classroom for more than 80% of the day and was progressing well.

The plaintiffs have appealed the decision of the hearing officer on the second and fourth issues. The defendant has not challenged the hearing officer's determinations on the other issues.

## II. STANDARD OF REVIEW

In general, a motion for summary judgment may not be granted unless the court

determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223 (2d Cir.1994). Rule 56(c) "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548.

Summary judgment is inappropriate only if the issue to be resolved is *both* genuine *and* related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Id.* As the Court observed in *Anderson,* "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* Thus, only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.,* 901 F.2d 1154, 1159 (2d Cir.1990).

In a case brought under the IDEA, a motion for summary judgment "often triggers more than an inquiry into possible disputed issues of fact." *Lillbask v. Connecticut Dep't. of Education,* 397 F.3d 77, 83 n. 3 (2d Cir.2005). Nevertheless, several courts have recognized that "summary judgment appears to be the most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions." *Wall v. Mattituck–Cutchogue School District,* 945 F.Supp. 501, 508 (E.D.N.Y.1996). *See also Lillbask,* 397 F.3d at 83 n. 3; *Warton,* 217 F.Supp.2d at 270. As the court observed in *Wall,* "[t]he inquiry, however, is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed. It matters not, in this context, who initiates the motion." *Wall,* 945 F.Supp. at 508. In this case, the extensive administrative record provides the court with a sufficient basis to determine the issues presented.

The initial responsibility for determining whether a child's individual education program (IEP) complies with the requirements of IDEA rests with administrative hearing officers. *Walczak v. Florida Union Free School Dist.,* 142 F.3d 119, 129 (2d Cir.1998). A federal court that is reviewing the findings and conclusions from an administrative proceeding under the IDEA must, after receiving records of the proceeding and hearing additional evidence at the request of a party, make an "independent" decision based on the preponderance of the evidence. 20 U.S.C.

§ 1415(i)(2)(C); *Board of Education of the Hendrick Hudson Central School District v. Rowley,* 458 U.S. 176, 205, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)(quoting S. Conf. Rep. No. 94–455, at 50 (1975)). The Supreme Court has cautioned that this provision should not be construed as "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034. Reviewing courts should give "due weight" to the administrative proceeding. *Id.*

Courts should be careful "to avoid imposing their view of preferable educational methods upon the States," mainly because "courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Id.* at 208, 102 S.Ct. 3034 (quoting *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 42, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)). The First Circuit has suggested that the Act "contemplates an intermediate standard of review ... [that] requires a more critical appraisal of the agency determination than clear-error review entails, but which nevertheless, falls well short of complete *de novo* review." *Lenn v. Portland School Committee,* 998 F.2d 1083, 1086 (1st Cir.1993). The court elaborated, "the judge is not at liberty to turn a blind eye to administrative findings or to discard them without sound reason." *Id.* at 1087. However, the due weight ordinarily afforded to state administrative hearings "is not implicated with respect to ... issue[s] of law," such as "the proper interpretation of the federal statute and its requirements." *Mrs. B. v. Milford Board of Education,* 103 F.3d 1114, 1122 (2d Cir. 1997).

Although the IDEA is silent with regard to which party bears the burden of proof in an administrative hearing challenging a child's IEP, the Supreme Court has recently clarified that it is properly placed upon the party seeking relief. *Schaffer v. Weast,* 546 U.S. 49, 62, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005). However, several states have decided to override the default rule and place the burden upon the school district in all cases by regulation. *Id.* at 61–62, 126 S.Ct. 528. The Supreme Court declined to decide the issue of whether states can legitimately enact such regulations. *Id.* Therefore, in this case, the burden of proof during the administrative hearing was properly placed upon the school district in accordance with Connecticut Department of Education regulations. These regulations state that "the public agency has the burden of proving the appropriateness of the child's program or placement, or of the program or placement proposed by the public agency," which "shall be met by a preponderance of the evidence." Conn. Reg. § 10–76h–14(a). However, courts in this district have held the party challenging the decision of the hearing officer before a district court bears the burden of proof. *See Warton,* 125 F.Supp.2d at 25 (D.Conn.2000); *Mr. and Mrs. H. v. Region 14 Board of Education,* 46 F.Supp.2d 106, 109 (D.Conn.1999).

## III. DISCUSSION

### A. *The IDEA*

The Supreme Court has noted that the IDEA "represents an ambitious federal effort to promote the education of handicapped children." *Rowley,* 458 U.S. at 179, 102 S.Ct. 3034. A state's eligibility for assistance under the Act depends upon its compliance with the Act's provisions. *See* 20 U.S.C § 1412(a). Under the Act, disabled students must receive a "free appropriate public education" in the "least

restrictive environment." 20 U.S.C. §§ 1412(a)(1), 1412(a)(5).

In *Rowley*, the Supreme Court held that the free appropriate public education requirement ("FAPE") is satisfied by "providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Rowley*, 458 U.S. at 203, 102 S.Ct. 3034. In order to achieve that objective, an individualized education program (IEP) must be developed and reviewed for each disabled child. This IEP must provide a statement of the child's present levels of educational performance, measurable annual goals, special education and supplementary aids or services for the child, and program modifications for the child. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(III). The IEP must also explain the extent to which the child will not participate with non-disabled children in regular classes or other activities, a projected date for the beginning of any special supplementary services or modifications, and the anticipated frequency, location, and duration of such services and modifications. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(IV)-(VI).

The child's IEP must be formulated with input from an individualized education program team consisting of the child's parents, the child's regular education teacher, a special education teacher, a representative of the local educational agency, and other individuals with knowledge and expertise regarding the child. *See* 20 U.S.C. § 1414(d)(1)(B). In developing the IEP, the team must consider behavioral interventions and strategies, the child's language and communication needs, and the need for assistive technology devices and services. *See* 20 U.S.C. § 1414(d)(3)(B). The IEP should be reviewed periodically and revised to address the child's progress, results of evaluations conducted, changes in the child's anticipated needs, and information provided by or to the parents. *See* 20 U.S.C. § 1414(d)(4)(A).

The Court in *Rowley* set forth a two-part inquiry for determining whether a school district has satisfied the FAPE requirement. First, the state must have "complied with the procedures set forth in the Act." *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034. These procedures enable parents of a disabled child to examine school records, participate in meetings, and present complaints. *See* 20 U.S.C. § 1415(b). Parents must also be given notice of any proposals to change the educational placement of a child, and they are entitled to an independent educational evaluation. *See id.* They can initiate an impartial due process hearing for failure to comply with the Act and bring a subsequent civil action challenging an adverse determination at the hearing. *See* 20 U.S.C. § 1415(f)-(i). Second, the IEP that is developed must be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034. Therefore, the IEP must be designed to enable the child to achieve passing marks and advance from grade to grade. *Id.* at 207, n. 28, 102 S.Ct. 3034.

As noted above, in addition to the FAPE requirement, the Act also requires that the education of disabled children take place in the least restrictive environment (LRE). This so-called "mainstreaming" requirement of the Act states, "[t]o the maximum extent appropriate, children with disabilities … are educated with children who are not disabled." *See* 20 U.S.C. § 1412(a)(5)(A). Furthermore, "removal of children with disabilities from the regular educational environment occurs only when the nature or the severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.*

Several courts have attempted to reconcile the apparent tension between the Act's mandates to provide an individualized education program tailored to each child's needs, while simultaneously integrating each disabled child into the regular classroom environment to the maximum extent appropriate. In *Daniel R.R. v. State Board of Education,* 874 F.2d 1036 (5th Cir.1989), the Fifth Circuit set forth a two-part inquiry to determine whether a school district has complied with the Act's provisions. First, courts must ask "whether education in the regular classroom, with the use of supplemental aids and services can be achieved satisfactorily." *Id.* at 1048. In *Oberti v. Board of Education of the Borough of Clementon School District,* 995 F.2d 1204, 1217–18 (3d Cir.1993), the Third Circuit summarized the factors that should be examined under the first prong of the test, including (1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom,[2] (2) the educational benefits available to the child in a regular class, with supplementary aids and services, as compared to the benefits in a special education class, and (3) the possible negative effects of the inclusion of the handicapped child on the education of other students in the classroom. No one factor is disposi-

tive, and the court must engage in a fact-sensitive inquiry in each case. *Daniel R.R.,* 874 F.2d at 1048. If a court determines that education in a regular classroom cannot be achieved satisfactorily, it turns to the second prong of the *Daniel R.R.* test, asking "whether the child has been mainstreamed to the maximum extent appropriate." *Id.* at 1050. "Thus, a school must take intermediate steps where appropriate, such as placing the child in regular education for some academic classes and in special education for others." *Id.*

The Third Circuit and the Eleventh Circuit have both adopted the *Daniel R.R.* test for evaluating challenges under the IDEA. *See Oberti,* 995 F.2d at 1215–18; *Greer v. Rome City School District,* 950 F.2d 688, 696–97 (11th Cir.1991).[3] Although the Second Circuit has never explicitly adopted the *Daniel R.R./Oberti* test, district courts within this district have employed it in connection with cases under the IDEA. *See e.g. A.S. v. Norwalk Board of Education,* 183 F.Supp.2d 534, 540–41 (D.Conn.2002); *Warton v. New Fairfield Board of Education,* 217 F.Supp.2d 261, 273–78 (D.Conn.2002). Although some other circuits have adopted alternative tests,[4] these do not track the

---

**2.** The Fifth Circuit observed that "the Act requires states to provide supplementary aids and services and to modify the regular education program when they mainstream handicapped children ... If the state is providing supplementary aids and services and is modifying its regular education program, we must examine whether its efforts are sufficient. The Act does not permit states to make mere token gestures to accommodate handicapped students ..." *Daniel R.R.,* 874 F.2d at 1048. Although the accommodation requirement is broad, the court recognizes that "states need not provide every conceivable supplementary aid or service to assist the child." *Id.*

**3.** The court in *Greer* also included the cost of supplemental aids and services furnished to

the child as a factor that should be considered under the test. *Greer,* 950 F.2d at 696–97. Cost, however, was not an issue raised in this case.

**4.** For example, the court in *Roncker v. Walter,* 700 F.2d 1058, 1063 (6th Cir.1983), held that, "[i]n a case where the segregated facility is considered superior [academically], the court should determine whether the services which make that placement superior could be feasibly provided in a non-segregated setting. If they can, the placement in the segregated school would be inappropriate under the Act." *See also A.W. v. Northwest R–1 School Dist.,* 813 F.2d 158, 163 (8th Cir.1987); *DeVries v. Fairfax County Sch. Bd.,* 882 F.2d 876, 879 (4th Cir.1989) (adopting the *Roncker* test).

language of the Act as closely.[5]

### B. *Least Restrictive Environment for the 2005–2006 School Year*

The first issue raised on appeal is whether the hearing officer erred in her decision that the school district complied with the mainstreaming directive of § 1412(a)(5)(A), which required educating the child in the least restrictive environment during the 2005–2006 school year. The plaintiff argues that the hearing officer failed to properly apply the *Daniel R.R./Oberti* test relied on by courts in this district to evaluate mainstreaming cases under the IDEA. Specifically, the plaintiff claims that the hearing officer merely stated her conclusion that the *Daniel R.R./Oberti* test had been satisfied without providing any explanation or analysis to support it.

In her final decision and order, the hearing officer stated, "[e]vidence of whether this school district has seriously considered regular education with supplementary aids and services is to be found within the disputed IEP as well as testimony of the Student's parents and staff." (AR–1 at 23). She added, "review of PPT minutes, IEP documentation and the testimony of all of the witnesses including the Parent and the consultant, Dr. Whitbread, who attended the PPT meetings, leads to the conclusion that the PPT gave serious consideration to the substantially full time (at least 80%) placement of the Student at the PPT meetings addressing the IEPs for the

2005–2006 school years." (*Id.*) Although the hearing officer did not present her analysis of the evidence by explicitly breaking out for purposes of discussion each of the prongs under the *Daniel R.R./Oberti* test, and the elements of each prong, she did provide a discernible basis for her decision. A review of the record supports the hearing officer's conclusion that the two-pronged test has been satisfied.

▉ The first prong of the *Daniel R.R./Oberti* test asks whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily. *Daniel R.R.*, 874 F.2d at 1048. With respect to this prong, reviewing courts should first examine the efforts the school district has undertaken to accommodate the disabled child in the regular classroom. *Id.; Oberti*, 995 F.2d at 1216. The evidence supports the hearing officer's conclusion that the school district made a significant effort to place P. in a regular classroom environment. Testimony from Nancy Wilcock, P.'s special education teacher, showed that she held numerous meetings with the child's parents to discuss his program and schedule. There were also several lengthy discussions by members of the PPT regarding the percentage of inclusion time P. would have in the regular classroom. The record reflects that P. was scheduled to spend approximately 74% of the school day with non-disabled students for the 2005–2006 school year. In addition to spending the

---

In addition, the Ninth Circuit has adopted a four-factor balancing test that examines (1) the educational benefits of full-time placement in the regular classroom; (2) the non-academic benefits of such placement; (3) the effect the disabled child has on the teacher and children in the regular class; and (4) the costs of mainstreaming the child. *See Sacramento School Dist. v. Rachel H.*, 14 F.3d 1398, 1404 (9th Cir.1994).

5. As the court in *Oberti* noted, the *Roncker* test is deficient in that it "fails to make clear that even if placement in the regular classroom cannot be achieved satisfactorily for the major portion of a particular child's education program, the school is still required to include that child in school programs with non-disabled children ... whenever possible." *Oberti*, 995 F.2d at 1215.

majority of his time in a regular education classroom, P. would participate in all specials, lunch, and recess with his non-disabled peers. Based on these facts, the hearing officer could have concluded that P. would be placed in a regular class "for a significant portion of the day." *Oberti*, 995 F.2d at 1215, n. 21.[6] In *Oberti*, court recognized that "children with disabilities who are placed in regular classrooms will most likely receive some special education and related services outside of the regular classroom, such as speech and language therapy or use of a resource room." *Id.* Therefore, it would not be unusual for P. to spend some portion of the school day working on skills specific to his needs outside of the regular classroom.

The plaintiff argues that the hearing officer failed to provide a clear benchmark for determining whether P. was in a regular class placement. The plaintiff relies on the settlement agreement in *P.J. v. State of Connecticut Board of Education*, No. 2:91CV00180 (RNC), for its argument that the Board did not seriously consider a regular class placement for P. because it did not integrate P. into a regular classroom for at least 80% of the school day. In the agreement in *P.J.*, the Connecticut Board of Education agreed to the goal of increasing "the percent of students with mental retardation or intellectual disability who are placed in regular classes, as measured by the federal definition (eighty (80) percent or more of the school day with non-disabled students)." (P.'s Mot. Summ. J., Attachment C at 3–4). The plaintiff emphasizes that the Board failed to meet this objective in P.'s case during the 2005–2006 school year.

However, the fact that the plaintiff was being mainstreamed for 74% of the school day in 2005–2006, as opposed to 80%, does not render the Board's proposed plan deficient under the IDEA, as long as the Board seriously considered such a placement with supplementary aids and services provided to the child. The hearing officer's conclusion that the Board gave due consideration to a regular placement for P. was well-supported by the testimony given by P.'s teachers and the minutes of various PPT meetings. The objective of increasing the number of students in regular class placement, set forth in the agreement in *P.J.*, does not override the importance of school districts developing programs that reflect the specific needs of each individual child. Moreover, the inclusion consultant, Dr. Whitbread testified on behalf of the parents at the administrative hearing that she believed that P's transition to an 80% placement should be gradual rather than immediate. Dr. Whitbread "recommended the team gradually increase to 80% inclusion" for P. (AR–15 at 14). She also wrote to Nancy Wilcock, "I have shared with [P's parents] that I feel some pullout time is beneficial. To me, a reasonable goal over the next year would be to increase his time in the general ed. environment from the current 60 or 65% to about 80%. I would not recommend that this be done suddenly." (B–85 at 1). Even when pull-out services were required, attempts were made to integrate the skills taught outside the classroom in the regular classroom setting. For example, members of the PPT agreed that one out of every six speech therapy sessions would occur within the regular classroom. This evidence suggests that the Board made reasonable efforts to include the child in a regular class placement to the extent such placement was consistent with his individual needs.

**6.** The Third Circuit defined "education in a regular classroom" as "placement in a regular class for a significant portion of the school day." *Oberti*, 995 F.2d at 1215, n. 21.

■ As the Fifth Circuit noted, "[t]he Act requires states to provide supplementary aids and services and to modify the regular education program when they mainstream handicapped children." *Daniel R.R.*, 874 F.2d at 1048. The Board, consistent with the Act, considered a wide range of supplemental aids and services to facilitate the child's placement in a regular classroom.[7] P. received the assistance of two paraprofessionals on a routine basis and occasionally had classes co-taught by his regular education and special education teachers. The 2005–2006 IEP made reference to a variety of program modifications and adaptations to accommodate P.'s needs. These included alternative texts, a tape recorder, modified worksheets, computer programs, and other visual and hearing aids. The IEP recommended that P. receive extra time on projects, more simplified tasks, review sessions, and re-phrased examination questions. It also suggested that P. be given preferential seating and a clear work area to minimize distractions.

Furthermore, the administrative record reflects that the school district attempted to modify the regular curriculum to accommodate P.'s needs in accordance with the regulations. P.'s special education teacher, Nancy Wilcock, testified that she spent a substantial amount of time consulting with his second grade teacher, Holly Mazur, regarding modification strategies. As a result of this consultation, Mazur was able to modify concepts and incorporate as much of the regular education curriculum as possible. In view of such testimony by school personnel, the hearing officer's conclusion that the school district fulfilled the Act's mainstreaming directive by providing

P. with supplementary aids in the regular classroom and making appropriate modifications to the general curriculum was supported by the evidence.

The plaintiff maintains that the school district failed to seriously consider an even broader array of supplementary aids and modifications which would have could have increased the amount of time spent by P. in a regular classroom setting. The court addresses each of plaintiff's contentions in turn.

(i) The plaintiff argues that the school district should have given greater consideration to modifying the general curriculum based largely on Dr. Whitbread's testimony that P. spent much of his time in the regular classroom participating in activities different from those of his non-disabled peers. However, the hearing officer legitimately could have placed less weight on the testimony of Dr. Whitbread because her observation time was limited to a mere four and a half hours during the entire 2004–2005 school year and given more weight to the testimony of Mazur, who testified that she spent substantial time on curriculum modification to accommodate P. Such credibility determinations are within the province of the hearing officer who witnessed the testimony first-hand.

(ii) The plaintiff argues that there were undue delays in developing a functional behavior plan that would have facilitated greater inclusion of P. into the regular classroom environment. With respect to the 2004–2005 school year, the parents' contentions have some merit. The school district had no comprehensive behavior plan in place and simply relied on outdated protocols to address P's behavioral issues

---

7. School districts must provide "a continuum of placements ... to meet the needs of handicapped children," which must "[m]ake provision for supplementary services (such as re-source room or itinerant instruction) to be provided in conjunction with regular class placement." 34 C.F.R. § 300.551.

in 2004–2005. Despite the emphasis on the need for an FBA by the CCMC in October 2004 and by Dr. Whitbread in December 2004, the FBA did not begin until very late in the spring of 2005. Partially for these reasons, the hearing officer found that the P's pull-out time could have been reduced for the 2004–2005 year if a proper FBA had been completed.

 However, it is clear that the Board did seriously consider developing a behavior plan for P: for the 2005–2006 school year. School officials announced their intention to do so at the April 15, 2005 PPT meeting. The 2005–2006 IEP mentioned the ongoing need for an analysis of P.'s behavior in order to develop proper protocols. The FBA was begun two weeks prior to the June 3, 2005 PPT meeting. However, the FBA was not completed prior to the hearing because the parents did not fully cooperate with the rest of the team in its development. An FBA attempts to determine the causes of a particular child's behavior through observations, analysis of data, and interviews. An interview with the parents of the disabled child would be important, if not essential, to the completion of a thorough FBA. Thus, the fact that there was a delay in completion of the FBA does not undermine the hearing officer's finding regarding the Board's actions with respect to the 2005–2006 school year.[8]

(iii) The plaintiff contends that the Board failed to retain an inclusion consultant following the expiration of Dr. Whitbread's contract. However, members of the PPT stipulated to a mutually agreeable behavior consultant, Dr. Ann Majure. Although the plaintiffs now claim that a behavioral consultant is qualitatively different from an inclusion consultant, the plaintiffs originally submitted the name of Dr. Majure as an acceptable *inclusion* specialist in a letter to school officials in June 2004. Thus, the hearing officer did not err in concluding that Dr. Majure was qualified to perform both consulting functions.

The plaintiff also argues that consideration of the inclusion consultant wrongly occurred after the development of the IEP for the 2005–2006 school year. Normally, the consideration of supplemental services must occur prior to and during the development of the IEP "so that the child's parents are meaningfully included in the process and so that school officials will not be permitted to 'determine what they believe to be the appropriate placement for a handicapped child and then attempt to justify this placement only after the proposed IEP is challenged by the child's parents.'" *A.S. v. Norwalk*, 183 F.Supp.2d at 542 (quoting *Greer*, 950 F.2d at 696). Here, P.'s parents were included in the process of developing the child's IEP every step of the way. Pursuant to the parents' request, Dr. Whitbread was retained by the district as an inclusion consultant in 2004–2005. When Dr. Whitbread's contract expired, the PPT began discussing hiring a new consultant. The minutes of the PPT meeting convened on June 3, 2005 to review and revise the child's IEP demonstrate that the Board agreed with the parent's request to hire an inclusion specialist with behavioral expertise for the 2005–2006 school year. On August 8, 2005, Dr. Majure was chosen as the consultant. Thus, contrary to the plaintiff's assertions, the record reflects discussions about the retention of an inclusion consultant during the entire period in question.

---

8. In her decision, the hearing officer stated that "[t]he Board and the Parents ... must complete the FBA at this time to address the Student's behavioral issues." (AR–1 at 28, n. 4).

(iv) The plaintiff argues that the Board failed to consider increasing the amount of consulting time between P.'s regular classroom and special education teachers. Although the hearing officer determined that the amount of time allotted for consulting in the child's IEP was insufficient, testimony from the teachers themselves demonstrated that sufficient planning actually occurred because the teachers, on their own initiative, made time beyond that specified in the IEP for consulting, and therefore, P. was not disadvantaged by this deficiency in the IEP.

(v) The plaintiff argues that there were unnecessary delays in conducting an ATE, which was not completed for approximately a year after the Board became aware of the need for one. However, the plaintiff overlooks the circumstances which led to the delay. The Board originally believed that the ATE would be performed by the CCMC in the fall of 2004 as part of its overall evaluation. When the Board discovered that the CCMC was unable to perform the ATE, it attempted to obtain the evaluation from another source, but P.'s parents requested that it be postponed until the completion of Dr. Whitbread's report. Dr. Whitbread released her report on December 13, 2005. At the February 2005 PPT meeting, the Board requested that the ATE be performed by Dr. McNamara of Southern Connecticut State University. The minutes of the April 2005 PPT meeting indicate that the ATE was being conducted later that spring, and the record indicates it was completed by Dr. McNamara on July 22, 2005. Although the process of procuring an ATE could have been expedited to a greater degree, the hearing officer's finding that the delay

was not entirely the fault of the Board was reasonable.

(vi) The plaintiff argues that the Board failed to seriously consider formal toilet training as a supplementary aid and service. However, P.'s parents had previously asserted that they did not want toilet training to be included in the development of their child's IEP and that they preferred to work on functional skills at home. In light of these facts, the hearing officer was correct in her finding that the Board should not be blamed for failing to include this supplementary aid in the 2005–2006 IEP.

(vii) The plaintiff contends that the Board failed to consider a consultation by a teacher for the hearing impaired as a supplementary service prior to the preparation of the 2005–2006 IEP. However, the IEP did suggest that the child receive hearing aids, an assistive technology device, and that P. be assisted and the devices be monitored by the school nurse on a daily basis.[9] Therefore, the Board considered supplementary services addressing P.'s hearing impairment.

(viii) Finally, the plaintiff argues that the staff working with P. lacked the training and experience necessary to integrate a child with his level of disability into regular classes. P.'s special education teacher and the two paraprofessionals had all worked with the student for three years; as would be expected, the regular education teachers did not work with P. year after year. Moreover, P.'s mother testified that his special education teacher was "dedicated, very hardworking, and committed." She also reported that they had good rapport and communicated frequently. In addition to Wilcock, who had worked with students with severe disabili-

9. Moreover, a teacher of the hearing impaired was retained by the Board in June 2005, very shortly after the IEP was developed for the 2005–2006 school year, and the record confirms that P. was in fact receiving assistance from the consultant in 2005–2006.

ties for over a decade, the staff included an experienced speech and language pathologist (who had worked in that capacity since 1981 and had been working with P. for three years), a licensed physical therapist (who had worked in that capacity for 22 years and had been working with P. for six years), and a nationally certified occupational therapist (who had been working for the Board for eight years and had worked with P. since he was three years old). Dr. Whitbread even complimented the staff on its implementation of the child's literacy program. The hearing officer's conclusion that the staff was sufficiently qualified to handle the child's concerns is well-supported by the evidence.

■ Thus, a review of the record reveals that the supplementary aids and services the plaintiff points to were either timely provided by the Board, provided by the Board after a delay to which the parents contributed, not provided at the insistence of the parents, or provided in another form. Although a broad range of appropriate supplementary aids and services must be considered, "states need not provide every conceivable supplementary aid or service to assist the child. Furthermore, the Act does not require regular education instructors to devote all or most of their time to one handicapped child or to modify the regular education program beyond recognition." *Daniel R.R.* 874 F.2d at 1048 (internal citations omitted).[10] Based on the evidence reviewed above, the hearing officer reason-

ably could have found that the Board made a significant effort to place P. in a regular classroom environment because it considered and implemented a sufficiently broad range of aids and services to enable the child to flourish in a regular education setting. The school district did not make mere "token gestures," but rather attempted to modify and supplement P.'s educational experience to a significant extent.

■ The second factor that courts must consider under the first prong of the *Daniel R.R./Oberti* test is the comparison between the educational benefits to the child in a regular classroom with the use of supplementary aids and the benefits of education in a separate classroom. *Daniel R.R.*, 874 F.2d at 1048; *Oberti*, 995 F.2d at 1216. Here, the plaintiff argues that the Board failed to prove that the benefits of separate instruction outweighed the unique benefits of regular education. In support of this argument, the plaintiff presented generic studies which conclude that disabled students derive significant benefits from an inclusive education including improvements in communications and social skills, academic performance, and overall self-esteem. The plaintiff also presented evidence specific to P.'s case about the appropriateness of the child's placement in a regular classroom through the testimony of his second-grade teacher, Mazur. It is apparent that the Board agreed that P. reaped important educational and social

---

**10.** The court elaborated, "If a regular education instructor must devote all of her time to one handicapped child, she will be acting as a special education teacher in a regular education classroom. Moreover, she will be focusing her attentions on one child to the detriment of her entire class, including, perhaps, other, equally deserving, handicapped children who also may require extra attention. Likewise, mainstreaming would be pointless if we forced instructors to modify the regular education curriculum to the extent that the handicapped child is not required to learn any of the skills normally taught in regular education. The child would be receiving special education instruction in the regular education classroom; the only advantage to such an arrangement would be that the child is sitting next to a nonhandicapped student." *Daniel R.R.*, 874 F.2d at 1048–49.

benefits from interaction with non-disabled students because the Board agreed with P's placement in a regular classroom for a significant portion of the day. However, the hearing officer's conclusion that there were also some unique benefits that could be derived from separate instruction is well-supported by the evidence. Even Dr. Whitbread, who testified on behalf of the plaintiff, conceded that occasional removal from the regular classroom for speech therapy and intensive literacy instruction was appropriate. The hearing officer properly found that there was value in some pullout services, which needed to be balanced against the benefits of complete integration.

The third and final factor that courts should consider under the first prong of the *Daniel R.R./Oberti* test is the potential negative effect of inclusion of the disabled child on the educational experience of other students in the classroom. *Daniel R.R.*, 874 F.2d at 1049; *Oberti*, 995 F.2d at 1217. The plaintiff argues that the Board failed to present any evidence of the negative effects of placing P. in a regular classroom. The plaintiff ignores evidence that P. experienced occasional behavior problems which prompted his removal from the classroom. Nevertheless, the record indicates that P. was not removed from class due to negative behavior frequently during the 2004–2005 school year. Indeed, the record suggests that the frequency of pull-outs necessitated by negative behavior could have been reduced through the use of a better protocol developed using the results of an FBA.

After considering in their totality the facts and circumstances relevant to the three factors under the first prong of the *Daniel R.R./Oberti* test, each of which is non-dispositive, the court concludes that the evidence produced during the administrative proceeding demonstrates that edu-

cation in the regular classroom, with the use of supplemental aids and services, could not be achieved satisfactorily for the 2005–2006 school year.

Turning to the second prong of the *Daniel R.R./Oberti* test, reviewing courts must examine whether the child has been mainstreamed to the maximum extent appropriate. *Daniel R.R.*, 874 F.2d at 1050; *Oberti*, 995 F.2d at 1218. The Act and the related regulations "do not contemplate an all-or-nothing educational system in which handicapped children attend either regular or special education. Rather, the Act and its regulations require schools to offer a continuum of placements." *Daniel R.R.*, 874 F.2d at 1050. The academic progress of a student may sometimes require teaching "in a more isolated and focused environment." *R.L. v. Plainville Board of Education*, 363 F.Supp.2d 222, 233 (D.Conn.2005).

The plaintiff argues that the school district did not make an effort include P. in school programs with non-disabled children to the maximum extent appropriate in the 2005–2006 school year. For many of the reasons cited earlier, the hearing officer's decision that the Board's actions satisfied the Act's mainstreaming directive is supported by the administrative record. Although P. benefited from placement in a regular class setting for a significant portion of the day, he required the provision of some services in a more segregated setting to increase his focus and minimize potential distractions. The inclusion consultant, Dr. Whitbread, recommended that literacy instruction occur in a quiet setting every day for 30 to 40 minutes so P. could work on phonological awareness. Whitbread concurred with the recommendation that five out of six speech therapy sessions take place in a related services room so P. could work on his preferred method of communication. P.'s

occupational therapist, Karen Daigle, believed that pull-out services and specialized instruction were sometimes necessitated by the fact that P. was easily distracted in the regular classroom, and the instruction required full attention. However, despite the fact that P. required these pull-out services, he was included in the regular education environment for approximately 74% of the school day. Dr. Whitbread agreed that the transition to a regular class placement, whereby P. would spend 80% or more of his day with his non-disabled peers, should be gradual rather than immediate. Therefore, the evidence in the record supports the hearing officer's finding that the school district included P. in the regular education environment to the maximum extent appropriate and removed him from that setting only when it was necessary for his individual needs.

### C. *Proposed Program for the 2005–2006 School Year*

 The plaintiff also challenges the hearing officer's decision that the Board's proposed program for the student for the 2005–2006 year provided P. with a free appropriate public education, as required by the IDEA. Assuming a school district complies with the Act's procedural requirements,[11] the Supreme Court has held that a student receives a free appropriate public education when that student's IEP is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034. The Court added that "[w]hen the handicapped child is being educated in the regular class-

rooms of a public school system, the achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit." *Id.* at 207 n. 28, 102 S.Ct. 3034. This standard "contemplates more than 'mere trivial advancement.' " *Mrs. B. v. Milford Board of Education*, 103 F.3d. at 1120–21 (2d Cir., 1997) (quoting *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 183 (3d Cir.1988)). However, the IDEA does not require states to develop IEPs that "maximize the potential of handicapped children." *Rowley*, 458 U.S. at 189, 102 S.Ct. 3034. It merely guarantees "an education that is 'appropriate,' not one that provides everything that might be thought desirable by 'loving parents.' " *Tucker v. Bay Shore Union Free Sch. Dist.*, 873 F.2d 563, 567 (2d Cir.1989) (internal citation omitted). The purpose of the Act "was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Rowley*, 458 U.S. at 192, 102 S.Ct. 3034.

 In this case, the hearing officer concluded that the Board "exercised appropriate discretion in formulating and implementing the Student's IEP for the 2005–2006 school year." (AR–1 at 30). She found that "[t]he Student's 2005–2006 program was individually designed after careful review of all evaluations to place the Student in regular classes with the supplementary aids and services, adjusted curriculum classes, and appropriate modifications, accommodations and related ser-

---

**11.** The plaintiff alleges certain procedural deficiencies in the child's 2005–2006 IEP, particularly the failure to perform a timely behavioral assessment and an assistive technology evaluation. However, as discussed above, evidence in the record suggests that school officials reviewed the need for these evaluations and the delay that occurred in performing them was not undue. Even if a procedural deficiency existed, the Second Circuit has noted that not "every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim v. Rhinebeck Central School Dist.* 346 F.3d 377, 381–382 (2d Cir.2003).

vices." (AR–1 at 31). The hearing officer concluded that the 2005–2006 IEP appropriately addressed both the student's strengths and weaknesses to enable him to participate in the regular education environment to the maximum extent appropriate.

The plaintiff claims that the child's earlier IEP failed to provide any meaningful educational benefit, citing the testimony of P.'s special education teacher, who characterized P.'s progress as "limited" (P's Mem. Supp. Summ. J. at 73) and minutes of the June 3, 2005 PPT meeting in which the Board's special education coordinator suggested that P's behavior had regressed to the point where the Board might have to consider an out-of-district placement. Second, the plaintiff reiterates the argument that the IEP failed to prescribe sufficient supplementary aids and services which could have made greater inclusion possible, including adequate training for staff, more consultation time between P.'s teachers, formal toilet training, an assistive technology evaluation, and a consultation by an instructor for the hearing impaired. Third, the plaintiff also contends the Board's program provided P. with insufficient time in a regular class placement and failed to consider appropriate behavioral interventions. The plaintiff insists that P.'s 2005–2006 IEP is beset by the same flaws as the 2004–2005 IEP, and that as a result, the hearing officer's decision is inconsistent.

With respect to the plaintiff's first argument, the evidence reflects that P. did make progress in achieving some of his academic goals and objectives. As the hearing officer noted, "the student ... is beginning to learn to read, write, do math, and follow school routines." (AR–1 at 19). In addition, P's "overall muscle strength and endurance and gross muscle skills have improved a lot," although he still has "significant delays when compared to his same age peers." (AR–1 at 7). With respect to the plaintiff's second argument, as is discussed above, the Board did provide a broad range of supplementary services and aids for P. in the 2005–2006 school year. Third, the plaintiff's conflation of the child's 2005–2006 IEP with that for the previous year, which the hearing officer found not appropriate, is not justified. The hearing officer explained the distinctions underlying her decision. Specifically, with respect to the 2004–2005 school year, the hearing officer pointed to the failure to appropriately address the child's behavioral issues, the fact that the inclusion time was discretionary in accordance with the 2004–2005 IEP, and the fact that appropriate consideration was not given to mainstreaming the child more than 60% of the time in the 2004–2005 school year. As discussed above, the Board made marked improvements in these areas in its proposed program for the following year, which led the hearing officer to conclude that the Board's proposed program for the 2005–2006 school year was appropriate. There was ample discussion about the need to address the student's behavioral incidents and an FBA was undertaken. Also, the amount of time the student was scheduled to participate in school programs with his non-disabled peers was increased from 63% to 74%.

The plaintiff also argues, based on testimony of Dr. Whitbread, that the Board's expectations for P.'s progress in the 2005–2006 IEP were unacceptably low. However, the hearing officer legitimately found that the IEP set forth measurable annual goals and specific short-term objectives that are reasonably attainable within a one year period. The 2005–2006 IEP notes the increase in the time the child will spend with his non-disabled peers. Unlike the previous year's IEP, it states that P. "will have access to all regular education

activities. He will participate with adult assistance unless he is receiving his individual instruction in related services room." (B–74 at 25). It limits the situations in which P. can be removed from a regular classroom to those in which one-on-one services are required to increase the child's focus and attention or those in which the child exhibits fatigue, acting out behavior, or behavior indicating a need for a break from the group. The 2005–2006 IEP also documents numerous program modifications relating to P.'s classroom materials and learning environment, in addition to recommending specific behavior management and instructional strategies. Although the Board may not have provided or recommended every aid or service desired by Mr. and Mrs. P., who have a strong desire to see their child progress, it did propose a program which satisfies the IDEA's requirement that a free appropriate public education be provided.

■ The evidence in the record supports the hearing officer's conclusion that the child's 2005–2006 IEP was reasonably calculated to enable the child to receive educational benefits.[12]

### D. The Sufficiency of the Remedy Ordered

If a school district deprives a child of a free appropriate public education, the statute directs the court to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). In *School*

**12.** The defendants argue that the parents' failure to object to the proposed IEP for 2005–2006 is persuasive evidence of its validity. Whether or not the parents objected to the proposed IEP is a disputed factual issue, but not a material one. Although the hearing officer found that the parents never made any specific requests to change the goals or objectives set forth in the IEP (*see* AR–1 at 14, 30), the testimony of the parents and other documentary evidence casts doubt on this finding.

*Committee of the Town Burlington v. Department of Education of Massachusetts,* 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), the Supreme Court held that appropriate relief could include reimbursement of expenses for parents who send their child to a private school in response to a deficient IEP. Some circuit courts have held that appropriate relief may also include "compensatory education," or replacement of educational services that should have been provided to a child before. *Reid v. District of Columbia,* 401 F.3d 516, 518, 522 (D.C.Cir.2005) (citing cases).

■ The hearing officer in this case ordered that P. receive compensatory education to remedy the deprivation of his statutory rights for the 2004–2005 school year. Specifically, the hearing officer ordered the Board to retain for one calendar year an inclusion consultant, such as Dr. Majure, with "considerable experience" in placing children with mental disabilities in regular classes. (AR–1 at 33). However, the hearing officer ordered no relief for the 2005–2006 school year because she found the Board's proposed program for that year to be appropriate.

The court concludes that the remedy ordered by the hearing officer was appropriate. The hearing officer ordered that:

The Board shall provide the Student with an inclusion consultant for one calendar year as compensatory education. The Board shall authorize the consultant

(*See* B76 at 2, 7) (P.'s parents "prepared a written statement, 'We disagree with the program proposed for our son, [P.], in the IEP dated 4–15–05' "). Also, even assuming the parents failed to object to the IEP, the plaintiff correctly notes that such a failure does not relieve the school district of its responsibility to provide a free appropriate education to the student. *See M.C. v. Central Regional School Dist.,* 81 F.3d 389, 396 (3d. Cir.1996).

to make observations of the program as needed, train the teaching and paraprofessional staff, review documents and data, consult with the team to develop and implement an appropriate IEP, attend planning meetings, participate in the completion of a functional behavioral assessment, and consult with the family as needed.

(AR–1 at 34). The hearing officer concluded that for one school year, i.e. the 2004–2005 school year, the school district had not properly addressed the student's behavior problems and had failed to give sufficient consideration to mainstreaming the student for more than 60% of the time. To remedy that situation, the hearing officer required the Board to provide P. with an inclusion consultant for one calendar year. It was required, *inter alia,* that the inclusion consultant participate in the completion of an FBA. This remedy addressed the areas in which the 2004–2005 IEP was deficient, and the period of time during which the additional support for P. was being provided was at least as long as the period during which P. had not been provided with a program that was appropriate.

Most of the plaintiff's arguments about the sufficiency of the remedy ordered focus on providing compensatory measures based on both the 2004–2005 and the 2005–2006 school years. However, because the deficient 2004–2005 IEP was followed by an appropriate IEP for the 2005–2006 school year, it was proper to base the compensatory measure on just the deficiencies during the 2004–2005 school year.[13]

### E. Attorney's Fees and Costs

Under the IDEA, the court can "award reasonable attorneys' fees as part of the costs … to a prevailing party who is the Parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B). To do so, the court must examine (i) whether the plaintiff was a prevailing party, (ii) whether the award of attorney's fees should be reduced to the extent that the plaintiff did not prevail, (iii) a reasonable rate for the attorney's services if fees are awarded, and (iv) whether the plaintiff is entitled to the costs and expenses incurred as a result of the litigation.

The Supreme Court has held that plaintiffs are prevailing parties "if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (citing *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978)). The Court characterized this as a "generous formulation that brings the plaintiff only across the statutory threshold." *Id.* However, a "purely technical or *de minimis* " victory will not qualify a plaintiff as a prevailing party. *Texas State Teachers Ass'n v. Garland Independent School District,* 489 U.S. 782, 792, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). At a minimum, a plaintiff "must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Id.* In other words, there must be "a causal connection between the litigation and the relief from the defendant." *G.M. v. New Britain Bd. of Educ.,* 173 F.3d 77, 81 (2d Cir.1999) (quoting *Wheeler v. Towanda Area Sch.*

---

13. The court disagrees with the defendant's argument that compensatory education is warranted only if there is a "gross" violation of the IDEA. The requirement of a gross violation before any relief can be granted has been applied only to cases involving claimants over the age of 21. *See Mrs. C. v. Wheaton,* 916 F.2d 69, 75 (2d Cir.1990); *Garro v. State of Conn.* 23 F.3d 734, 737 (2d Cir.1994).

*Dist.,* 950 F.2d 128, 131 (3d Cir.1991)). Moreover, the relief obtained as a result of the litigation must be judicially-sanctioned. *Buckhannon Bd. and Care Home Inc. v. West Virginia Dept. of Health,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). The Second Circuit has noted, "[i]n applying the prevailing party standard, it is helpful to identify the relief sought and compare it with the relief obtained as a result of the suit ... [a] plaintiff may be considered a prevailing party even though the relief ultimately obtained is not identical to the relief demanded in the complaint, provided the relief obtained is of the same general type." *Koster v. Perales,* 903 F.2d 131, 133–35 (2d Cir. 1990). These same standards are applicable in IDEA cases. *J.C. v. Regional School Dist. 10, Board of Education,* 278 F.3d 119, 124 (2d Cir.2002). Courts in this district have further held that a prevailing party at an administrative hearing under the IDEA can obtain attorney's fees, even if no subsequent federal court action was filed. *See L.C. v. Waterbury Board of Education,* 2002 WL 519715 *2 (D.Conn. 2002) (citing cases).

▉▉▉ The plaintiff argues that he is a prevailing party under the Act because he prevailed on three out of the five issues presented at the administrative hearing. Finding in favor of the plaintiffs, the hearing officer concluded that the child's 2004–2005 IEP was not appropriate and that the Board did not seriously consider a regular class placement for the child with supplementary aids and services for that school year. As a result, the hearing officer ordered that the plaintiff was entitled to some measure of compensatory education for the deficiencies in the 2004–2005 school year. The hearing officer also concluded that the Board's request for a psychiatric evaluation of the child could not proceed without the parents' consent. Because of

the success achieved by the plaintiff with respect to the issues relating to the 2004–2005 IEP, which were significant issues in the proceeding, and the non-trivial benefit conferred upon the plaintiff as a result, the court finds that the plaintiff has satisfied the fairly low statutory threshold in order to qualify as a prevailing party at the administrative hearing.

The next issue the court must address is whether the award of attorney's fees should be reduced to the extent that the plaintiff did not succeed. The Supreme Court has held, "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee ... In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933. The Court noted that "the most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* at 434, 103 S.Ct. 1933. However, if a plaintiff "has achieved only partial or limited success," a full compensatory fee may be "excessive" even if "the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." *Id.* at 435–36, 103 S.Ct. 1933. In such a case, the court has discretion to reduce the award to account for the plaintiff's limited success. *Id.* at 436–37, 103 S.Ct. 1933.

▉▉▉ The plaintiff argues that a full compensatory fee is warranted based on the "excellent results" achieved at the administrative hearing. The plaintiff contends that he obtained most of the relief sought when he initiated the due process hearing. Specifically, the plaintiff argues that the hearing officer ordered the retention of a mutually-agreeable consultant with broadly-defined duties to facilitate

P.'s transition into a regular class placement in the face of the defendant's intransigence. The plaintiff points to Mrs. P.'s testimony that the school district refused to oblige her request regarding the extension of Dr. Whitbread's contract for an additional year. Mrs. P. testified that the Board indicated that it did not need any further assistance with inclusion at the April PPT. Therefore, the plaintiff argues that the hearing officer's decision requiring the Board to retain a mutually-agreeable consultant, which the plaintiff contends eventually led to a regular class placement for P., achieved most of the results the plaintiff sought to achieve by bringing the due process action.

The court finds that the plaintiff is entitled to the recovery of attorney's fees for services rendered in connection with the administrative hearing and litigation to secure the fee award, but that the amount should be reduced to reflect the extent of the success plaintiff achieved. The plaintiff did not prevail on either of the issues related to the Board's program for P. for the 2005–2006 school year. P. did obtain an important victory on the issues relating to the 2004–2005 IEP, but the plaintiff overstates the extent of the success. Although the testimony suggests that the school district refused to extend the contract of Dr. Whitbread, minutes of a PPT meeting held on June 3, 2005, prior to the commencement of the due process hearing, indicate that the Board had already agreed to hire a mutually-agreeable consultant. Thus, there is some merit to the defendant's argument that the hearing officer did not require the performance of any task that the Board was not already seeking to accomplish—although the hearing officer's order ensured that the consultant would be retained for a full year and would have an active role in implementing an appropriate program for the child. Moreover, the fact that the plaintiff did not

achieve most of the relief being sought is evident from the plaintiff's desire to pursue this federal court action challenging the decision of the hearing officer. Indeed, the plaintiff's contention that the hearing officer's remedy for the violation of P.'s rights under the IDEA in 2004–2005 was wholly inadequate. is difficult to reconcile with the plaintiff's assertion that "excellent results" were achieved in the administrative hearing. The plaintiff prevailed on two of the four major issues presented to the hearing officer, warranting a 50% award of attorney's fees. In addition, the court concludes than an additional 10% should be awarded because the plaintiff prevailed on the issue related to the psychiatric evaluation of the child without the parents' consent.

Therefore, the court finds that a 40% reduction with respect to attorney's fees is warranted to account for the plaintiff's limited success.

■■■ The defendant argues that the award of attorney's fees should be further reduced on the grounds that the plaintiff should not be reimbursed for unreasonable or vague entries in its billing records. Counsel seeking fees does not have to "record in great detail how each minute of [their] time was expended." *Hensley,* 461 U.S. at 437, n. 12, 103 S.Ct. 1933. However, attorneys must "keep and present records from which the court may determine the nature of the work done, [and] the need for and the amount of time reasonably required." *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1265 (2d Cir.1987).

■■■ Although most of the billing records provided by Attorney David Shaw satisfy this standard, the defendant argues that 16.4 hours of time entries are vague and should be not be considered by the court. Attorney Shaw argues that these

entries, put down as "preparation for a hearing," are not vague because the nature of the work can be readily ascertained by reviewing what happened at the administrative hearing the following day. Nevertheless, such entries have been rejected by courts in this district because they do not provide an adequate basis for the court to evaluate the reasonableness of the services and hours expended by the attorney. *See C.C. v. Granby Board of Education*, 453 F.Supp.2d 569, 576 (D.Conn.2006); *G.M. v. New Britain Board of Education*, 2000 WL 435577, at \*5 (D.Conn.2000). Accordingly, the court will reduce by 16.4 hours the number of hours used to determine attorney's fees, prior to applying the 40% reduction, to account for these entries.

▆▆▆▆ The defendant argues that a further reduction in fees is justified on the grounds that the plaintiff unreasonably protracted the final resolution of the controversy and spent an excessive amount of time performing particular legal services. With respect to the first contention, the court finds that the child's parents brought the administrative hearing challenging the school district's actions only after first registering their complaints with the Board and receiving what they perceived as an unsatisfactory response. Especially in light the hearing officer's decision on the inappropriateness of the child's 2004–2005 IEP, the decision of the parents to invoke their right to a due process hearing should not be viewed as an effort to unreasonably protract resolution of the controversy. The court also concludes that the parents exercised good faith in bringing this federal court action to appeal the findings of the administrative hearing officer with respect to the 2005–2006 IEP. Although the parents did obtain some of the relief they originally sought at the administrative hearing, they did not obtain all of it and consequently decided to initiate this action.

Thus, a reduction for unnecessary prolongation of the litigation is not warranted under 20 U.S.C. § 1415(i)(3)(F)(i). With respect to the second argument, i.e. that the plaintiff spent an excessive amount of time working on the memorandum of law in support of the plaintiff's motion for summary judgment, the court does not find the 74.7 hours recorded to be unreasonable given the complexity of the case and the extensiveness of the factual record. Moreover, the defendant has not produced any evidence to suggest that an attorney with similar experience would have spent less time on such research and writing. Thus, a reduction on this basis is not appropriate.

(iii) Next, the court must to determine the appropriate rate for the attorney's fees being awarded in this case. The appropriate rate for an attorney's fee under the IDEA is "based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." 20 U.S.C. § 1415(i)(3)(C). The Supreme Court has indicated that fees should be "calculated according to prevailing market rates in the relevant community" ... "for similar services by lawyers of comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. at 895, 104 S.Ct. 1541. The Second Circuit approved the lodestar method for calculating attorney's fees, whereby reasonable hours expended are multiplied by this reasonable rate. *G.M. v. New Britain Board*, 173 F.3d 77, 84 (2d Cir. 1999).

The plaintiff submits that a reasonable fee for the services he performed in this case would be $375 per hour. In support of this claim, Attorney Shaw has submitted an affidavit from a partner in a law firm who has participated in setting billing rates in his firm and has reviewed market analyses of attorney billing rates. This

affidavit states that the prevailing rate charged by Connecticut based law firms for complex civil litigation for an attorney with thirty years of experience is within the range of $385 to $415 per hour. On the other hand, in a recent case in this district, the court concluded that a reasonable rate for representation by Attorney Shaw in proceedings under the IDEA is $315 per hour, which reflected an increase over rates approved by other judges in the district for similar cases involving Attorney Shaw. *See C.C. v. Granby Board of Education*, 453 F.Supp.2d 569, 574 (D.Conn.2006); *C.G. v. New Haven Board of Education*, 988 F.Supp. 60, 69 (D.Conn. 1997) (citing earlier cases). Considering the submissions of the parties and the rates approved in the district for similar cases, the court concludes that a reasonable rate for Attorney Shaw's representation in this case is $315 per hour.

The plaintiff also requests reimbursement for 49.2 hours of time spent by Attorney Shaw's paralegal during the administrative proceeding at a rate of $75 per hour. Other judges in the district have found this to be a reasonable rate for such services. *C.C. v. Granby*, 453 F.Supp.2d at 576. Therefore, the court grants the plaintiff's request for reimbursement of paralegal fees at that rate.

 Finally, the court must determine whether the plaintiff should be reimbursed for $517.91 in costs and expenses related to this litigation. The defendant has challenged $44.80 for the cost of issuing a subpoena to an expert witness at the un-

derlying hearing as a non-recoverable expert fee under the IDEA. The Supreme Court has held that expert fees for services rendered to a prevailing party in an IDEA action are not costs recoverable under the IDEA's fee-shifting provision. *Arlington Cent. School District Board of Education v. Murphy*, —— U.S. ——, ——––——, 126 S.Ct. 2455, 2459–2464, 165 L.Ed.2d 526 (2006). Although the plaintiff cannot recover compensation paid to experts for testifying, they can recover fees associated with service of documents. *See LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir.1998) (prevailing parties can be reimbursed for "reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients"); 28 U.S.C. § 1920; L.R. 54(c)(1). Thus, the cost for service of a subpoena to an expert witness is reimbursable to the plaintiff.

The plaintiff has submitted a request for a total of $181,995.31 in attorney's fees, costs, and expenses. The court has determined that 16.4 hours of Attorney Shaw's time should not be considered, that the fee should be computed at a rate of $315 per hour for Attorney Shaw, and that the amount of attorney's fees should be reduced by 40% to reflect the limited success of the plaintiff at the administrative hearing and in this federal court action. The plaintiffs are also awarded $517.91 for costs and expenses. Thus, plaintiff is awarded attorneys' fees, costs, and the expenses in the total amount of $89,237.21.[14]

---

14. The $181,995.31 arrived at by Attorney Shaw is based on 474.1 hours of work by Attorney Shaw at a rate of $375 per hour (401 hours of work according to the billing records originally submitted with the plaintiff's motion for summary judgment plus an additional 73.1 hours spent on additional briefing), 49.2 hours of work by his paralegal at a rate of $75 per hour, and $517.81 in costs. The court's figure was arrived at by adding 457.7 hours of work by Attorney Shaw (474.1 hours discounted by 16.4 hours for vague entries) at a rate of $315 per hour and 49.2 hours of work by his paralegal at a rate of $75 per hour. This sum of $147,865.50 was reduced by 40% for limited success. This amount of $88,719.30 was added to $517.91 for costs and expenses, resulting in an award to the

## IV. Conclusion

For the reasons set forth above, the plaintiff's motion for summary judgment (Doc. No. 22) is hereby DENIED, except with respect to the plaintiff's claim for attorney's fees and costs; the defendant's motion for summary judgment (Doc. No. 25) is hereby GRANTED, except with respect to the plaintiff's claim for attorney's fees and costs; and the plaintiff's motion for attorney's fees (Doc. No. 42) is hereby GRANTED in part.

It is so ordered.

The Clerk shall close this case.

plaintiff of $89,237.21 in attorney's fee, costs, and expenses.