07-4652-cv
P. by his Parents v. Newington Bd of Ed.

# UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued: September 3, 2008          Decided: October 9, 2008)

Docket No. 07-4652-cv

_____

P., BY AND THROUGH HIS PARENTS/NEXT FRIENDS, MR. AND MRS. P.,

*Plaintiff-Appellant,*

—v.—

NEWINGTON BD OF ED,

*Defendant-Appellee.*

_____

B e f o r e : SACK and KATZMANN, *Circuit Judges*, RAKOFF, *District Judge*[1].

_____

Appeal of a final judgment of the United States District Court for the District of Connecticut (Alvin W. Thompson, *J.*) granting defendant's motion for summary judgment, and affirming the decision of an administrative hearing officer that the plaintiff elementary-school student's Individualized Education Plan for the 2005-2006 academic year complied with the requirement under the Individuals with Disabilities Education Act that disabled students be educated in the "least restrictive environment." We affirm and today adopt a case- and fact-specific test for determining whether a student has been placed in the least restrictive environment, considering whether, with the aid of appropriate supplemental aids and services, full-time education in the regular classroom may be achieved, and, if not, whether the school has included the student in regular classes, programs, and activities to the maximum extent appropriate.

_____

[1] The Honorable Jed S. Rakoff of the United States District Court for the Southern District of New York, sitting by designation.

Counsel for Plaintiff-Appellant:   DAVID C. SHAW, Bloomfield, Conn.

Counsel for Defendant-Appellee:   MARK J. SOMMARUGA, Sullivan, Schoen, Campane & Connon, LLC, Hartford, Conn.

_____

KATZMANN, *Circuit Judge*:

This case calls upon us to adopt a standard by which courts in this circuit should assess whether a disabled child has been placed in the "least restrictive environment," as required by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1412(a)(5). The plaintiff, P., suing by and through his parents, is a child with Down Syndrome attending public school in the Town of Newington, Connecticut. He contends that the 2005-2006 Individualized Education Plan (IEP) devised for him at his elementary school did not include enough regular-classroom time, and therefore did not place him in the least restrictive environment as mandated by the IDEA. P. challenged the IEP before an administrative hearing officer, who held that the school complied with the statute. P. appealed that decision to the United States District Court for the District of Connecticut (Alvin W. Thompson, *J.*), which affirmed, granting summary judgment to the defendant Newington Board of Education. Today, we affirm the decision of the district court and join several of our sister circuits in holding that determining whether a student has been placed in the "least restrictive environment" requires a flexible, fact-specific analysis, considering whether, with the aid of appropriate supplemental aids and services, education in the regular classroom may be achieved, and, if not, whether the school has included the student in regular classes, programs, and activities to the maximum extent appropriate. Applying that analysis to the case before us, we affirm the decisions of the hearing officer and district court that the defendant fulfilled its obligations under the IDEA.

I.      The IDEA Requirement of an IEP

The IDEA "represents an ambitious federal effort to promote the education of

2

handicapped children." *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 179 (1982) (interpreting the Education for All Handicapped Children Act, subsequently renamed IDEA). The statute provides federal assistance for education of children with disabilities and requires that states receiving such assistance provide disabled students with a "free appropriate public education" in "the least restrictive environment," 20 U.S.C. § 1412(a)(1), (5), and devise an IEP for each disabled student. The IEP is crafted and revised by a team consisting of the child's parents, the child's regular-classroom teacher, a special-education teacher, a representative of the local educational agency, and other individuals with knowledge and expertise regarding the child. *Id.* § 1414(d)(1)(B). The IEP must include a statement of the child's present level of academic and functional performance, measurable annual goals, special-education and supplemental services, and any program modifications for the child, along with an explanation of the extent to which the child will not participate with non-disabled children in regular classes and activities, a projected date for the beginning of any special supplementary services or modifications, and the anticipated frequency, location, and duration of such services and modifications. *Id.* § 1414(d)(1)(A)(i). In developing the IEP, the team must consider the child's strengths, the concerns of the parents, the results of the most recent evaluation of the child, and the academic, developmental, and functional needs of the child, along with other "special factors" particular to children with certain needs. *Id.* § 1414(d)(3)(A), (B). The local educational agency must ensure that the IEP is reviewed periodically, no less than annually, "to determine whether the annual goals for the child are being achieved," and to revise the IEP as needed based on the child's progress and anticipated needs. *Id.* § 1414(d)(4).

A child's parents must be notified of any change in a child's educational program, *id.*

3

§ 1415(b)(3), and if a child's parents are dissatisfied with an IEP, they may file a complaint with the state's educational agency. *Id.* § 1415(b)(6). Such complaints are resolved at an "impartial due process hearing," *id.* § 1415(f), and any party aggrieved by the outcome may bring an appeal in any state or federal court of competent jurisdiction, *id.* § 1415(i)(2), which will then "fashion appropriate relief based on its assessment of a preponderance of the evidence developed at the administrative proceedings and any further evidence presented by the parties." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122-23 (2d Cir. 1998).

II.     Factual Background

A.      The Development of P.'s 2004-2005 and 2005-2006 IEPs

P. suffers from Down Syndrome, hearing impairment, and other significant health problems that have required several serious procedures, including surgery to repair a hole in his heart and multiple bowel operations, as a result of which he is not toilet trained. At the time relevant to this litigation, he was a student at the Anna Reynolds Elementary School in Newington, Connecticut. Among the assigned staff at the school working with P. have been the special-education teacher, two paraprofessionals, a speech pathologist, a physical therapist, and an occupational therapist. In the spring of 2004, when P. was eight, the school district's behavioral consultant, Greg Smith, informed his parents that it was becoming increasingly difficult to keep P. in a regular classroom, as the gap in ability between P. and his peers was growing and would grow larger. Moreover, at various times, P. had exhibited some behavior problems, including kicking, grabbing, and pulling hair. P.'s mother strongly disagreed with Smith's assessment and wanted her son to remain in a regular classroom with his non-disabled peers as much as possible.

4

On May 28, 2004, the group assigned to formulate P.'s IEP, the "Performance and Planning Team" (PPT), met to discuss plans for the 2004-2005 school year. At that meeting, P.'s parents stated that they wanted their son to be in a regular classroom at least 80% of the time during the upcoming school year. Instead, the IEP provided that P. be in the classroom for 60% of the school day, with "pull-out" services for occupational and speech therapy in separate classrooms, and the plan did not include any measures to deal with P.'s burgeoning behavior problems. In order to facilitate increased inclusion in the regular classroom, P.'s parents asked that a consultant specializing in such matters be hired, and in accordance with their request, the Board retained Dr. Kathleen Whitbread to evaluate P. Additionally, later in the summer of 2004, the Connecticut Children's Medical Center (CCMC) performed a psychological evaluation of P., in which he was found to have social-interaction and communication skills equivalent to those of an average two-year-old child. The report also found that P. communicated primarily through "signs, gestures, and single words" and exhibited "serious problem behaviors," including "disruptive behavior, destructiveness to property, and hurting others." The report concluded that "[P.] will need pervasive support, much more than others his age, because of very limited adaptive behaviors and because of problem behaviors." A "functional behavior assessment" (FBA) to assess behavior problems was not performed, nor was an "assistive technology evaluation" (ATE), which tests the extent to which assistive technology may facilitate inclusion into the regular-classroom environment.

Dr. Whitbread completed her evaluation on December 13, 2004. In the report, based on two hours of observation of P. at home and 4.5 hours of observation of him in the classroom, Dr. Whitbread described P.'s behavior problems as "moderately serious" and opined that the PPT

5

had done "a commendable job of ensuring that [P.] spends the majority of the day with non-disabled peers." Nevertheless, she recommended that P.'s instruction be more closely connected to the general education curriculum. Dr. Whitbread also recommended consultation with a teacher of the hearing impaired and a program of literacy instruction.

According to the testimony of his second-grade teacher, Ms. Mazur, P.'s behavior improved during 2004-2005. He was only removed from the regular classroom three times due to behavior problems that caused or risked physical harm to another person, though timeouts were used. Ms. Mazur also explained that, although she frequently co-taught classes with the special-education teacher, Nancy Wilcock, to integrate P. into regular lessons, in at least some circumstances, "[P.] will need individualized instruction to make sure that he . . . is receiving the best instruction without distraction."

The PPT next met with Dr. Whitbread to discuss her findings and the CCMC evaluation on February 11, 2005. At the meeting, the PPT accepted her recommendations for an ATE and literary instruction. Although Dr. Whitbread stated at the meeting that P. would benefit from additional regular-classroom time, she also contended that some of his literacy instruction might need to take place outside the classroom. The PPT did not, however, reach any conclusions and decided to reconvene in April.

Prior to the April meeting, Dr. Whitbread and Ms. Wilcock, the special-education teacher who had been working with P. for three years, exchanged e-mails regarding appropriate next steps. In one of these e-mails, Dr. Whitbread stated:

> Time out of the classroom is a concern of [P.'s] parents and it is important to them that [P.] be fully included. Their goal is 100% of the time in a gen. ed. class. I have shared with them that I feel some pullout time is beneficial. To me, a

6

reasonable goal over the next year would be to increase his time in the general ed. environment from the current 60 or 65% to about 80%. I would not recommend that this be done suddenly. I realize this is going to be a difficult discussion since there are differences in opinion about what is best for [P.]. My hope is that we can have a productive conversation, with the understanding that compromise may be necessary.

This email is consistent with Dr. Whitbread's later testimony before the hearing officer in this case, during which she confirmed that she "recommended working up to 80 percent . . . that in [her] experience it's not productive to go in and say right now you must do this." But Dr. Whitbread also clarified her definition of "gradual": "I would have liked to see that happen over a month, two months, maybe three months, but certainly not years."

The PPT next convened on April 15, 2005, with Dr. Whitbread again in attendance. At the meeting, the special-education teacher, Ms. Wilcock, noted that P.'s behavior had improved, but that his attention span was limited. P.'s parents again emphasized their preference that their son's regular-classroom time increase from 60% to 80% in the upcoming year. Although the PPT scheduled another meeting in June to discuss the question, it indicated that at least some of P.'s speech-therapy sessions would occur in the regular classroom, and that all parties agreed that he would undergo some physical therapy instead of regular physical education (although he would still participate in some regular physical education). Dr. Whitbread again stated her recommendation that the team "gradually increase to 80% inclusion for [P.]."

The PPT next met on June 3, 2005. Notes from the meeting indicate that an FBA for P. had begun two weeks prior, and that all parties agreed that the school would hire a mutually agreeable behavioral specialist. With respect to the percentage of time P. would spend in the classroom, however, the parties were unable to reach a consensus, and P.'s parents lodged their

7

disagreement with the plan in writing.  Dr. Whitbread later testified that the PPT engaged in a "very long tedious process" while attempting to determine the appropriate amount of classroom time.  Ultimately, the IEP provided that P.'s regular-classroom time would increase from 60% to 74%, with participation in "all regular class[es]," except when he needed to be educated separately to "increase his focus/attention" or when he needed to be removed from the regular classroom "due to fatigue . . . or behavior which indicates [a] need for a break from the group."  The IEP also mandated the following supplemental assistance for P.: daily check of P.'s hearing aids in the health room, adult assistance in all activities in the regular classroom, assistive computer programs, extra time and directions on assignments, routines and schedules in pictures instead of words, preferential seating, and a clear work area.  The IEP also provided for weekly consultation between the regular and special education teachers.

On June 9, 2005, P.'s parents requested an administrative hearing to challenge both the 2004-2005 and 2005-2006 IEPs, primarily on the ground that P. was not sufficiently integrated into the regular classroom.

Meanwhile, the PPT met again prior to the beginning of the school year, on August 18, 2005.  At that meeting, the parties agreed to the hiring of a mutually agreeable behavioral and inclusion consultant, Dr. Ann Majure.  Also, by that time, the school had hired a hearing-impairment consultant and another consultant to assist with implementing assistive-technology recommendations.

During a meeting on April 7, 2006, the PPT mandated that P. be placed in a regular classroom for 80% or more of the school day, pursuant in part to the recommendation of Dr. Majure.  At oral argument in this case, the parties noted that since that time P. has been included

in the regular classroom at least 80% of the time.

B.    Litigation Before the Hearing Officer and the District Court

Pursuant to P.'s parents' request, hearing officer Mary Elizabeth Oppenheim held a hearing on P.'s parents' challenge to his 2004-2005 and 2005-2006 IEPs. She heard testimony from P.'s parents, Dr. Whitbread, Ms. Wilcock, and several other teachers and special-education professionals. After exhaustively reviewing the record, and noting that the Board bore the burden of proof in proving the IEPs' compliance with the IDEA, the hearing officer held in a thirty-five page opinion that the 2004-2005 IEP did not comply with IDEA, but that the 2005-2006 IEP did. The 2004-2005 IEP was deficient because too much of the division between regular and special classroom time was left to the discretion of school authorities and because P.'s behavioral issues were not appropriately addressed. As a "compensatory education" remedy for the deficiencies of the 2004-2005 IEP, the hearing officer required that the Board retain an inclusion consultant with "considerable experience in placing children with mental retardation in regular classes," and held that Dr. Majure, whom the school had already hired, could fill that role appropriately. The Board does not appeal the hearing officer's findings with respect to the 2004-2005 IEP.

The hearing officer found, however, that the 2005-2006 IEP complied with the requirements of the IDEA. Emphasizing Dr. Whitbread's statements that she thought P.'s regular-classroom time should increase gradually to 80% and that P. required some special-education services outside of the classroom, the hearing officer found that the PPT gave sufficient consideration to including P. in the classroom to the maximum extent appropriate. The hearing officer also took note of the extensive efforts the school had made on P.'s behalf,

9

including the numerous supplemental aids, services, and additional teachers employed to assist P. throughout the day, the mutually agreed-upon behavioral consultant hired in 2005, and that the school had modified the curriculum to meet P.'s needs. Moreover, it was clear that P. was included with non-disabled students for around 73% of the time in 2005-2006, and "participate[d] in all specials, lunch, [and] recess."

P. subsequently appealed to the United States District Court for the District of Connecticut the ruling that the 2005-2006 IEP was sufficient and the sufficiency of the remedy awarded for the deficiencies in the 2004-2005 IEP. Both parties cross-moved for summary judgment, and the district court issued an opinion affirming the hearing officer's decision and awarding P. partial attorneys' fees and costs.[2] *P. v. Newington Bd. of Educ.*, 512 F. Supp. 2d 89 (D. Conn. 2007). Applying the two-pronged test adopted by the Third Circuit in *Oberti v. Clementon School District*, 995 F.2d 1204, 1215 (3d Cir. 1993), the district court held that the evidence supported the hearing officer's ruling. 512 F. Supp. 2d at 102-09. P. now appeals the district court's decision.

III.    Discussion

A.    Standard of Review

We review de novo a district court's award of summary judgment in an IDEA case. *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005). Whether the district court correctly applied the IDEA's statutory and regulatory provisions to the facts of a particular case is a mixed question of law and fact, which we also review de novo. *See J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 64 (2d Cir. 2000). But the "role of the reviewing court in making these assessments

---

[2] The Board does not challenge the fee award on appeal.

10

is circumscribed" under the IDEA and the Supreme Court's decision in *Board of Education of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176 (1982). *Muller v. Comm. on Special Educ.*, 145 F.3d 95, 101 (2d Cir. 1998). Although school officials' decisions are subject to "independent" judicial review, the "responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998). Independent judicial review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review." *Rowley*, 458 U.S. at 206. And "[w]hile federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Walczak*, 142 F.3d at 129 (internal quotation marks omitted) (quoting *Rowley*, 458 U.S. at 206, 208)). "Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful." *Id.* Therefore, while our review is de novo, it is tinged with a significant degree of deference to the state educational agency, as we are essentially acting in an administrative-law-style capacity. *See Lillbask v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (noting that "a motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact. Rather, the motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the . . . IDEA.") (internal quotation marks omitted).

   *Rowley* prescribes a two-step inquiry: we must assess (1) whether the state complied with

the procedural requirements of the IDEA, and (2) whether the challenged IEP was "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206-07. The plaintiffs here do not allege that the IDEA's procedural requirements were not met. Rather, they challenge only whether the IEP was "reasonably calculated to enable the child to receive educational benefits" – in particular, whether the IEP complied with the IDEA's statutory mandate that P. be educated in the "least restrictive environment." Under this second "substantive" prong of the *Rowley* test, a state need not "'maximize the potential of handicapped children,'" but the door of public education must be opened in a "'meaningful' way," and the IEP must provide the opportunity for more than only "'trivial advancement.'" *Walczak*, 142 F.3d at 130 (quoting *Rowley*, 458 U.S. at 189, 192, and *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1121 (2d Cir. 1997)); *see also Cerra*, 427 F.3d at 194-95.

B. Fashioning a Test for Assessing Placement in the "Least Restrictive Environment"

The IDEA mandates that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A); *Walczak*, 142 F.3d at 122. "Educating a handicapped child in a regular education classroom . . . is familiarly known as 'mainstreaming.'" *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1039 (5th Cir. 1989). We have underscored the IDEA's "strong preference for children with disabilities to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers." *Walczak*, 142 F.3d at 122. Nevertheless,

12

we have also acknowledged that, "[w]hile mainstreaming is an important objective, we are mindful that the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students. Under the [IDEA], where the nature or severity of the handicap is such that education in regular classes cannot be achieved satisfactorily, mainstreaming is inappropriate." *Briggs v. Bd. of Educ. of Conn.*, 882 F.2d 688, 692 (2d Cir. 1989) (citations omitted); *see also Lachman v. Ill. State Bd. of Educ.*, 852 F.2d 290, 295 (7th Cir. 1988). Understandably, courts have recognized some tension between the IDEA's goal of providing an education suited to a student's particular needs and its goal of educating that student with his non-disabled peers as much as circumstances allow. *Daniel R.R.*, 874 F.2d at 1044. As such, courts have used a case-by-case analysis in reviewing whether both of those goals have been optimally accommodated under particular circumstances. *Id.* at 1048.

We have not yet explicitly stated a test for whether an IEP places a student in the least restrictive environment. *See Jennifer D. v. N.Y. City Dep't of Educ.*, 550 F. Supp. 2d 420, 430 (S.D.N.Y. 2008).[3] We conclude today that the two-pronged approach adopted by the Third, Fifth, Ninth, Tenth, and Eleventh Circuits provides appropriate guidance to the district courts without "too intrusive an inquiry into the educational policy choices that Congress deliberately left to state and local school officials." *Daniel R.R.*, 874 F.2d at 1046. Pursuant to that test, a court should consider, first, "whether education in the regular classroom, with the use of

---

[3] In *Briggs*, we cited the district court's use of, but did not adopt ourselves, the Sixth Circuit's approach in *Roncker ex rel. Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983), to least-restrictive-environment cases: "In a case where the segregated facility is considered superior, the court should determine whether the services which make that placement superior could be feasibly provided in a non-segregated setting." *Briggs*, 882 F.2d at 692 (quoting *Roncker*, 700 F.2d at 1063); *see also A.W. v. Nw. R-1 Sch. Dist.*, 813 F.2d 158, 163 (8th Cir. 1987) (adopting the Sixth Circuit's approach).

supplemental aids and services, can be achieved satisfactorily for a given child," and, if not, then

"whether the school has mainstreamed the child to the maximum extent appropriate." *Id.* at

1048; *see also L.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 976 (10th Cir. 2004); *Sacramento City*

*Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398, 1403-04 (9th Cir. 1994) (slightly modified

version); *Oberti v. Clementon Sch. Dist.*, 995 F.2d 1204, 1215 (3d Cir. 1993); *Greer v. Rome*

*City Sch. Dist.*, 950 F.2d 688, 696 (11th Cir. 1991). We today explicitly endorse that two-

pronged test, as elucidated and augmented by Judge Becker for the Third Circuit in *Oberti*:

> In sum, in determining whether a child with disabilities can be educated
> satisfactorily in a regular class with supplemental aids and services (the first
> prong of the two-part mainstreaming test we adopt today), the court should
> consider several factors, including: (1) whether the school district has made
> reasonable efforts to accommodate the child in a regular classroom; (2) the
> educational benefits available to the child in a regular class, with appropriate
> supplementary aids and services, as compared to the benefits provided in a
> special education class; and (3) the possible negative effects of the inclusion of
> the child on the education of the other students in the class.
>
> If, after considering these factors, the court determines that the school district
> was justified in removing the child from the regular classroom and providing
> education in a segregated, special education class, the court must consider the
> second prong of the mainstreaming test – whether the school has included the
> child in school programs with nondisabled children to the maximum extent
> appropriate.

995 F.2d at 1217-18 (footnote omitted).[4]  Both counsel for the parents and the Board in the case

---

[4]Although *Daniel R.R.* did not expressly denominate it as one of the "factors" to be
analyzed, some courts adopting the two-part test have also included in the first prong an analysis
of the costs of the supplementary aids and services necessary to maintain the child in the regular-
classroom environment. *See, e.g.*, *Rachel H.*, 14 F.3d at 1404; *Greer*, 950 F.2d at 697. "These
circuits' [least restrictive environment] tests acknowledge the fiscal reality that school districts
with limited resources must balance the needs of each disabled child with the needs of the other
children in the district." *L.B.*, 379 F.3d at 977 (not deciding whether costs should be taken into
account since the issue was not presented in the case). We need not consider in this case whether
costs should be taken into account because the Board has not raised the issue as a defense.
Accordingly, we leave that question for another day. *See also Oberti*, 995 F.2d at 1218 n.25

14

at hand support this framework.

Although we adopt the *Oberti* approach, we also note that this list of factors is not exhaustive; courts facing these cases must engage in an individualized and fact-specific inquiry into the nature of the student's condition and the school's particular efforts to accommodate it, ever mindful of the IDEA's purpose of educating children with disabilities, "'to the maximum extent appropriate,' together with their non-disabled peers." *Walczak*, 142 F.3d at 122; *see also Oberti*, 995 F.2d at 1217 n.25; *Daniel R.R.*, 874 F.2d at 1048. Moreover, courts must keep in mind our deferential position with respect to state educational authorities crafting educational policy. *Walczak*, 142 F.3d at 129. Nevertheless, our review must be searching, and we must recognize that even when educational authorities act with the best intentions they may sometimes fall short of their obligations under the IDEA, and courts must then act to ensure compliance with Congress's directives.

C.    The *Oberti* Analysis Applied to This Case

We now turn to whether the Board's actions with respect to the 2005-2006 IEP pass muster under the test we have adopted, which both the district court and hearing officer referenced and applied.[5] Our review is against the backdrop of the ultimate conclusion of the IEP, which resolved that P. would be in the regular classroom 74% of the time, and Dr.

---

(taking the same approach, noting that "[a]dditional factors may be relevant depending on the circumstances of the specific case").

[5] Because both opinions below essentially applied the test we today adopt, there is no need to remand in order for the hearing officer to apply it in the first instance. Moreover, even if the proceedings below had not been analyzed according to the standard we adopt today, we find that the facts in the record support the district court's grant of summary judgment. *See Chase Manhattan Bank, N.A. v. Am. Nat'l Bank & Trust Co.*, 93 F.3d 1064, 1072 (2d Cir. 1996).

Whitbread's statements that P.'s regular-classroom time should be gradually ramped up to 80%. The first prong of the test asks whether a student can be satisfactorily educated in the regular classroom with the benefit of supplemental aids and services. As noted, we also consider whether the school made reasonable efforts to accommodate the student, the benefits and drawbacks to the student of full-time integration into the regular classroom, and the possible negative impact on other students of the disabled student's presence. Although, in light of the improvements in P.'s behavior, there did not appear to be a significant negative impact on other students arising from his inclusion in the regular classroom, we see no error in the district court's conclusions that P. could not be educated in the regular class room full-time[6] and that the school had made significant efforts to integrate P. to the maximum extent possible. The school utilized a variety of supplemental aids, including several additional professionals, and modified the curriculum appropriately. Moreover, the hearing officer permissibly relied on the testimony of Dr. Whitbread that P. required pull-out services for reading, math, and speech therapy. *See Poolaw v. Bishop*, 67 F.3d 830, 835 (9th Cir. 1995) (affirming adequacy of IEP when the school "offered a variety of supplemental aids and services, coupled with varying degrees of placement in the regular classroom to mainstream [the student] to the maximum extent appropriate"); *Daniel R.R.*, 874 F.2d at 1050 (affirming some special-classroom instruction when the school "has taken creative steps to provide [the student] as much access to nonhandicapped students as it can, while providing him an education that is tailored to his unique needs"). We therefore agree with this district court's conclusion that "the evidence produced during the administrative proceeding demonstrates that education in the regular classroom, with the use of supplemental

_____

[6] Indeed, P.'s parents sought only 80% inclusion.

16

aids and services, could not be achieved satisfactorily for the 2005-2006 school year." *P.*, 512 F. Supp. 2d at 108.

Turning to the second prong of the test, we must assess "whether the school has included the child in school programs with nondisabled children to the maximum extent appropriate." *Oberti*, 995 F.2d at 1218. Continuing to keep in mind that the IEP mandated 74% inclusion in the regular classroom, as opposed to P.'s parents' proposed 80% – a difference of approximately 2-3 hours per week – we find no error in the district court's conclusion that, given P.'s need for some specialized instruction outside the regular classroom, he was mainstreamed to the maximum extent appropriate.

P. argues that this Court should adopt a presumption that a student should be placed in a regular classroom 80% of the time and contends that the district court erred by failing to apply such a presumption. P. bases this argument on a class-action settlement in which the Connecticut State Department of Education agreed that it would be a "desired outcome[]" for disabled students to spend 80% of the school day with non-disabled students. Recognizing that Connecticut school authorities may have found this percentage figure useful, we conclude that mandating such a percentage in every case would be inconsistent with the IDEA's directive that schools take an individualized approach to each student. *See Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir. 2006) (noting that the IDEA requires "special education and related services tailored to meet the unique needs of a particular child") (internal quotation marks omitted); *Briggs*, 882 F.2d at 692 (noting that "the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students"); *Daniel R.R.*, 874 F.2d at 1050 (noting that the IDEA does not envision an "all-or-

17

nothing" approach, but a continuum of services on which the best program for each child may be identified). We do not think that 80% is presumptively adequate or that less than 80% is presumptively inadequate. Children with disabilities must be educated with their non-disabled peers "[t]o the maximum extent appropriate," 20 U.S.C. § 1412(a)(5)(A); *Walczak*, 142 F.3d at 122. As the word "appropriate" suggests, the objective of providing an education tailored to each student's particular needs does not admit of statistical generalizations. While including students in the regular classroom as much as is practicable is undoubtedly a central goal of the IDEA, schools must attempt to achieve that goal in light of the equally important objective of providing an education appropriately tailored to each student's particular needs. *See Bd. of Educ. of Murphysboro v. Ill. Bd. of Educ.*, 41 F.3d 1162, 1168 (7th Cir. 1994) (stating that least-restrictive-environment requirement "was not developed to promote integration with non-disabled peers at the expense of other IDEA educational requirements").

We recognize and appreciate P.'s parents' dedicated advocacy on his behalf. But the evidence before the hearing officer and the records of the several PPT meetings devoted to developing P.'s 2005-2006 IEP demonstrate that the school fulfilled its duty under the IDEA to craft a tailored educational plan that included P. in regular classes to the maximum extent appropriate. We therefore affirm the district court's conclusion that the school's actions were sufficient under the two-pronged test and that the 2005-2006 IEP placed P. in the "least restrictive environment" under the IDEA.

D. The Remedy for Deficiencies in the 2004-2005 IEP

P. also argues on appeal that the compensatory-education remedy mandated by the hearing officer for deficiencies in the 2004-2005 IEP was insufficient. Those deficiencies, which

18

the Board did not contest in the district court, were that the school district had not properly addressed P.'s behavioral problems and had failed to give sufficient consideration to mainstreaming the student for more than 60% of the time. In response to the inadequacies of that IEP, the hearing officer ordered that the school hire a professional consultant on issues of inclusion, and that that consultant participate in the completion of an FBA. P. argues that the remedy was illusory because the school had already hired an inclusion consultant, Dr. Majure.

We affirm the remedy awarded by the hearing officer. The IDEA allows a hearing officer to fashion an appropriate remedy, and we have held compensatory education is an available option under the Act to make up for denial of a free and appropriate public education. *Mrs. C. v. Wheaton*, 916 F.2d 69, 75-76 (2d Cir. 1990); *see also Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005). The remedy's mandates in this case – that an inclusion consultant be retained for a year, requiring the school to keep Dr. Majure on for at least that long, and completion of an FBA – appropriately addressed the problems with the IEP, especially when considered in light of the fact that P. is now included in at least 80% of regular-classroom activities, in part due to Dr. Majure's recommendations. *See Parents of Student W. v. Puyallup Sch. Dist.*, 31 F.3d 1489, 1497 (9th Cir. 1994) ("Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA."). We therefore see no infirmity in the hearing officer's chosen remedy.

CONCLUSION

The judgment of the district court granting summary judgment to the Board is **AFFIRMED**.

19