**T.M., by A.M. and R.M., his parents, Plaintiffs,**

**v.**

**CORNWALL CENTRAL SCHOOL DISTRICT, Defendant.**

**No. 11 CV 6459(VB).**

United States District Court, S.D. New York.

Sept. 26, 2012.

Gary S. Mayerson, Maria Christine McGinley, Tracey Spencer Walsh, Mayerson & Associates, New York, NY, for Plaintiff.

Karen S. Norlander, Christopher P. Langlois, Girvin & Ferlazzo, P.C., Albany, NY, for Defendant.

### MEMORANDUM DECISION

BRICCETTI, District Judge.

Plaintiff T.M. ("TM"), by his parents A.M. and R.M. (collectively "parents"), bring this action pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"),[1] 20 U.S.C. § 1400, *et seq.*, against defendant Cornwall Central

---

1. In 2004, Congress reauthorized the Individuals with Disabilities Education Act ("IDEA") as the Individuals with Disabilities Education Improvement Act.

School District ("the district"). Parents seek judicial review of a decision by a State Review Officer ("SRO") at the New York State Education Department which found the district's proposed Individualized Education Program ("IEP") for the 2010–11 academic year offered TM a free appropriate public education ("FAPE").

Parents move for summary judgment (Doc. # 7) and the district cross-moves for summary judgment (Doc. # 15).[2] For the reasons set forth below, parents' motion is DENIED, and the district's motion is GRANTED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

### I. Statutory Framework

■ The IDEA was enacted to promote the education of disabled children. See Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 179, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). States receiving public funds are required to provide a FAPE to children with disabilities. 20 U.S.C. § 1412(a)(1)(A). Public school districts must provide "special education and related services tailored to meet the unique needs of a particular child, [which are] 'reasonably calculated to enable the child to receive educational benefits.' " Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir.1998) (quoting Rowley, 458 U.S. at 207, 102 S.Ct. 3034). These services are determined by the student's IEP, which school districts

must develop periodically in collaboration with the child's parents. See 20 U.S.C. § 1414(d)(2)(A).

In New York, if the parents disagree with any part of the IEP process they may request an impartial due process hearing, which is administered by an impartial hearing officer ("IHO") appointed by the local board of education. See 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1)(a). The IHO's decision may be appealed to an SRO. See N.Y. Educ. Law § 4404(2); see also 20 U.S.C. § 1415(g). The SRO's decision may be challenged in state or federal court. See 20 U.S.C. § 1415(i)(2)(A).

■ A board of education may be required to reimburse parents for private educational services if: (1) the services offered by the board of education were inadequate or inappropriate; (2) the services selected by the parents were appropriate; and (3) equitable considerations favor the parents' claim. See Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369–70, 374, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993) (the "Burlington factors").

### II. Factual Background [3]

#### A. TM's Early Education

TM is an autistic child who was born July 29, 2004. He was classified as a child with a disability around the age of two and is eligible for special education services from the district. (Tr. at 38–40.)[4] In

2. The Court resolved parents' pendency motion in a separate ruling, dated August 7, 2012 (Doc. # 28).

3. The Court has issued a separate opinion regarding TM's pendency placement (Doc. # 28). The Court assumes familiarity with the factual background and legal conclusions

set forth in that opinion, and does not repeat them here.

4. For purposes of this opinion, "JX" refers to joint exhibits introduced during the administrative proceedings, and "PX" refers to the parent exhibits. "Tr." refers to the transcript of the hearings.

preschool, TM attended a general education program and received occupational therapy ("OT"), physical therapy ("PT"), and speech-language therapy. (*Id.* at 40–47.) He also received Special Education Itinerant Teacher ("SEIT") services provided by a board certified behavior analyst (":BCBA") both at home and at school, and his parents received training and counseling. (*Id.*)

In anticipation of TM's transition to school-age programming, the district convened its Committee on Special Education ("CSE") in Spring 2009. (Tr. at 47–48.) The CSE obtained educational, OT, PT, speech-language, and applied behavioral analysis ("ABA") evaluations and prepared several IEPs for the 2009–10 school year. (*Id.* at 47–48, 51–56.)

Parents rejected the district's proposals and unilaterally enrolled TM in a general education developmental kindergarten class at Butterhill Day School ("Butterhill"), where he received SEIT, OT, PT, and speech-language services. (JX 15 at 1–2.) Parents privately arranged to continue the services contained in the May 29, 2009, IEP at their own expense. (*Id.*) The parents requested an impartial hearing, which was ultimately resolved by a stipulation of settlement on October 30, 2009. (Tr. at 51–53.) Parents agreed to pay for the Butterhill placement and the district agreed to reimburse parents for 25 hours per week of 1:1 SEIT services, three 30–minute sessions of 1:1 speech-language therapy per week, two 45–minute sessions of 1:1 OT per week, two 45–minute sessions of 1:1 PT per week, and three 60–minute sessions of parent counseling and training per month. The parties agreed that the stipulation constituted a monetary settlement of parents' claims for the 2009–10 school year only, and did not constitute evidence of support for parents' program. (JX 15 at 2.)

## B. *The 2010–11 IEP*

The CSE performed several observations of TM at Butterhill in preparation for his 2010–11 IEP, and held meetings on March 19 and April 16, 2010, during which its members discussed potential educational programs. (JX 13.) The March 19, 2010, meeting participants included the district director of pupil personnel services, a first grade teacher, special education teacher, occupational and physical therapists, and a school psychologist; as well as TM's private ABA program supervisor, occupational and speech-language therapists, and parents. (Tr. at 346; PX V at 2, 61.) The April 16, 2010, meeting participants included the district director of pupil personnel services, speech-language pathologist, occupational and physical therapists, school psychologist, special education teacher, and regular education teacher; as well as TM's private ABA program supervisor, occupational and physical therapists, and TM's mother. (JX 14 at 6.)

The record shows the following documents were considered in the development of TM's 2010–11 IEP: (1) a February 8, 2010, speech-language observation by the districts speech-language pathologist (JX 25); (2) an OT evaluation and progress summary report prepared on March 2, 2010, by TM's occupational therapist (JX 20); (3) a PT evaluation and progress summary report prepared on March 2, 2010, by TM's physical therapist (JX 21); (4) an ABA evaluation conducted on March 3, 2010, by TM's SEIT (JX 19); (5) a March 8, 2010, report of classroom observations by the school psychologist (JX 26); (6) a speech-language evaluation and progress summary report prepared on March 9, 2010, by TM's speech-language pathologist (JX 22); (7) a March 12, 2010, OT observation by the district's occupational therapist

(JX 18); (8) a March 12, 2010, PT observation by the district's physical therapist (JX 17); and (9) a March 2010 report of classroom observations by the district's special education teacher (JX 23).

On April 16, 2010, the district proposed its initial IEP for the 2010–11 school year, which began on July 6, 2010 ("April IEP"). (JX 14 at 1–2.) The IEP recommended extended school year ("ESY") services for July and August, and a separate program for September 2010 through June 2011. (*Id.*)

The CSE recommended ESY services for July and August 2010, in which TM would be placed in a 12:1+1 special class[5] for three hours per day, with two 30–minute sessions of 1:1 OT in a "non-integrated" location, two 30–minutes sessions of 1:1 PT in a "flexible" location, two 30–minute sessions of speech-language therapy in a "non-integrated" location, and one 30–minute session of group (5:1) speech-language therapy in a "non-integrated" location. (*Id.* at 2.) The IEP for the summer did not include parent training and counseling or behavioral consultant to teaching assistant services. (*Id.*) However, the district director of pupil personnel services testified that the omission of a 1:1 teaching assistant and behavior consultation services for the ESY program was a clerical error. (Tr. at 581–85.) The director assured TM's mother that these services would be added to the IEP when they met on June 10, 2010 (*id.*), and TM's mother confirmed that the conversation occurred. (Tr. at 136–37, 147.)

The April IEP contained a different placement for September 2010–June 2010. (JX 14 at 1–2.) It recommended TM be placed in a general education kindergarten class at a district elementary school, with English language arts ("ELA") and math instruction in a 12:1+1 special class for 45 minutes per day. (*Id.* at 1.) The IEP recommended the following related services: two 45–minute sessions of 1:1 OT per week, two 30–minute sessions of PT per week, three 30–minute sessions of 1:1 speech-language therapy per week, one 30–minute session of group (5:1) speech-language therapy per week, and a 1:1 teaching assistant for six hours per day. (*Id.* at 1–2.) The IEP recommended TM receive two hours per week of direct services from a behavioral consultant. (*Id.* at 2–3.) The behavioral consultant would also provide parents with 60 minutes per month of training and counseling, and consult with school staff for 60 minutes once per month. (*Id.*) The CSE recommended a 30–minute team meeting for staff once per month. (*Id.* at 3.)

Parents rejected the April IEP on June 16, 2010, and demanded a due process hearing (JX 13.) They enrolled TM in a kindergarten program at Butterhill and arranged to continue those services contained in the May 29, 2009, IEP. (JX 1 at 4–5.)

The CSE reconvened on August 20, 2010, and the meeting participants included the district director of pupil personnel services, a district regular education teacher, special education teacher, school psychologist, speech-language pathologist, occupational therapist, physical therapist, and behavior intervention specialist, and TM's mother. (JX 2 at 7.) The CSE reviewed and modified the IEP, and reviewed a functional behavioral assessment ("FBA") conducted by TM's ABA program supervisor in May 2010. (JX 2 at 8; JX 11.) The CSE issued a new IEP ("August

---

**5.** This terminology refers to a class composed of twelve students, one teacher, and one teaching assistant.

IEP"), which modified the September 2010–June 2011 program by adding an additional 30–minute session of 1:1 speech-language therapy, increasing the weekly 5:1 speech-language session from 30 minutes to one hour, and increasing the frequency of the 30–minute staff team meetings from once per month to once per week. (JX 2 at 3.) The IEP also indicated the general education staff would receive support from the special education teacher for 15 minutes per week (*Id.* at 4.) The IEP finally indicated that, with parental consent, the district's behavior specialist would collect data and observe the student during the first month of school to develop an FBA and a behavioral intervention plan ("BIP") if necessary. (*Id.* at 3.)

Parents rejected the August IEP and filed an amended due process complaint. (JX 46.)

### C. *The IHO Decision*

An impartial hearing was convened before IHO Mindy G. Wolman on September 13, 2010, and concluded on January 31, 2011, after eight days of testimony. The IHO issued a separate order determining pendency on February 2, 2011, which the district appealed.[6]

On May 16, 2011, the IHO issued her decision on the merits of parents' objection to the IEP ("IHO Decision"). The IHO found the district's proposed 2010–11 IEP failed to provide TM with a FAPE. (IHO Decision at 18.) The IHO found the summer program to be insufficient because the recommended 12:1 + 1 class did not place TM in the least restrictive environment ("LRE"). (*Id.* at 12.) According to the IHO, because the CSE recommended a general education classroom for the September 2010–June 2011 part of the school year, it was aware TM could function in a

general classroom and should have provided such a placement during the summer with appropriate supports; the fact that the district did not provide a mainstream offering during summer school did not relieve the district of its obligation. (*Id.* at 12–13.) The IHO also found the summer program to be inadequate because the April 2010 IEP did not include the supplementary services of a behavior consultant or a 1:1 teaching assistant, which the parties deemed necessary for supervising TM's ABA instruction. (*Id.* at 13.) The IHO also concluded the record did not support a finding that TM would have been suitably grouped for instructional purposes. (*Id.* at 13.)

The IHO further found the CSE's recommendations for the September 2010–June 2011 part of the school year were not reasonably calculated to provide TM with meaningful educational benefits. (*Id.* at 14.) The IHO found that although the CSE performed multiple observations prior to its meetings, it did not sufficiently evaluate TM because it did not include cognitive testing or standardized assessments of TM's academic achievement. (*Id.* at 14–15.) The CSE also did not consider a May 2010 FBA, nor did it conduct an FBA or develop a BIP as part of the IEP process despite the fact that it was aware of TM's interfering behaviors. (*Id.*) The IHO found that the IEP's reference to a possible future FBA and BIP was insufficient, and that deferring the FBA and BIP for up to a month after TM started school would lead to regression. (*Id.* at 15–16.) The IHO also found the IEPs described TM's academic functional levels in narrative rather than numerical form, and did not include objective data on TM's cognitive function, grade equivalents, percentile scores, or standard scores for academic achievement for mathematics, reading, and

---

6. On August 22, 2011, the SRO affirmed the IHO's pendency order.

writing. (*Id.* at 15.) The IHO concluded the general education class size of 25 students was too large, since the testimony established TM needed to be in a class with no more than 15 students. (*Id.* at 17.) She also concluded the recommendation for special class instruction for reading and math was overly restrictive, and the provision of related services in the form of "pull-out" rather than "push-in" sessions during the course of the school day would deprive TM of a predictable routine that was necessary for proper socialization. (*Id.* at 17.) The IHO found the IEP did not provide sufficient continuity and structure for TM, nor did it include sufficient behavior consultant support. (*Id.* at 17–18.)

Finally, the IHO found parents' placement of TM at Butterhill was appropriate and that equitable factors favored tuition reimbursement. (*Id.* at 19–20.) Thus, the IHO ordered the district to reimburse the parents for the cost of TM's educational program at Butterhill. (*Id.* at 21.)

The district appealed from the IHO Decision.

### D. *The SRO Decision*

SRO Stephanie Deyoe issued a single-spaced, thirty-one page decision on August 22, 2011("SRO Decision"), in which she overruled the IHO Decision on the merits and concluded the district's proposed 2010–11 IEP did offer TM a FAPE for both the summer of 2010 and the regular 2010–11 school year. (SRO Decision at 31.)

The SRO held the evaluations and observations considered by the March, April, and August CSEs and reflected on the April and August 2010 IEPs were sufficiently comprehensive to identify all of TM's special educational needs. (*Id.* at 18, 21–22.) She also found any interfering behaviors exhibited by TM did not require an FBA or BIP, and that such behaviors were not of such a frequency or degree so as to impede his learning or that of other students and could be adequately addressed by redirection and refocusing. (*Id.* at 24, 26.)

The SRO found the IHO erred in concluding the district denied TM a FAPE based on the finding that the summer placement was not TM's LRE. (*Id.* at 31.) The SRO found the IHO erred in applying the LRE analysis to TM's summer program without taking into consideration that the district does not have an obligation to provide ESY services to nondisabled students and did not have any summer programs for non-disabled students in which the student could be placed. (*Id.*)

As for the September 2010–June 2011 school year, the SRO found TM's placement in a classroom of 25 students was not inappropriate, and that the district thoughtfully considered parents' concerns regarding that placement and recommended numerous special education services designed to support TM in that environment. (*Id.* at 27.) The SRO found the August IEP included sufficient support from a behavior consultant. (*Id.*) The SRO noted that although the IHO cited only two hours per week of consultant services, the August 2010 IEP actually recommended TM be provided with two hours per week of direct services from the specialist and the specialist provide school staff with 60 minutes per week of indirect consultation, as well as 60 minutes per month of parent training and counseling. (*Id.*) The SRO found TM's proposed placement in a 12:1 + 1 special class for ELA and math was the LRE for his needs, and that while TM required a special class setting for those subjects, the IEP maximized his inclusion with general education peers in the remainder of the school programs. (*Id.* at 29.)

Having determined the district offered TM a FAPE for the 2010–11 school year, the SRO declined to reach the remaining *Burlington* factors. (*Id.* at 31.)

On September 15, 2011, parents filed this action appealing the SRO's decision.

## DISCUSSION

### I. *Applicable Legal Standards*

■ Motions for summary judgment usually resolve IDEA cases in federal court. *See Viola v. Arlington Cent. Sch. Dist.*, 414 F.Supp.2d 366, 377 (S.D.N.Y. 2006). Unlike in an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat the motion. *Id.* Rather, summary judgment in the IDEA context functions as an appeal from an administrative decision. *T.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir.2009).

In a review action pursuant to the IDEA, the Court (1) reviews the records of the administrative proceedings; (2) hears additional evidence at the request of a party; and (3) grants such relief as it deems appropriate based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C); *see Grim v. Rhinebeck Cent. Sch. Dist.,* 346 F.3d 377, 380 (2d Cir.2003).

■ The standard of review for IDEA cases has been characterized as "modified *de novo*." *M.R. v. South Orangetown Cent. Sch. Dist.*, 2011 WL 6307563, at *6 (S.D.N.Y. Dec. 16, 2011). Although the court must engage in an independent review of the record and make a determination based on a preponderance of the evidence, its review of state administrative decisions is limited. *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. at 205–06, 102 S.Ct. 3034; *Walczak v. Fla. Union Free Sch. Dist.*, 142

F.3d at 129. The Supreme Court and the Second Circuit have cautioned that the IDEA requires "substantial deference to state administrative bodies on matters of educational policy." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir.2005). Thus, the court must be mindful "that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," *Walczak*, 142 F.3d at 129, and should not "substitute [its] own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034. Deference is particularly appropriate where the SRO's review has been "thorough and careful." *Walczak*, 142 F.3d at 129. In short, the court should not disturb an SRO decision that "is reasoned and supported by the record." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 114 (2d Cir.2007). This is true even when the SRO disagrees with the IHO's determination. *See M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 241 (2d Cir.2012) (citing *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir.2009)).

As the Second Circuit recently clarified in *M.H. v. New York City Dep't of Educ.*, "the district court's determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role." 685 F.3d at 244. Courts should afford more weight to SRO determinations when they involve the substantive adequacy of an IEP. *Id.* (citing *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d at 195). Furthermore, the Court should afford more deference to the SRO when the decision is "grounded in thorough· and logical reasoning" and when the Court's "review is based entirely on

the same evidence as that before the SRO." *Id.*

## II. *The 2010–11 IEP*

Parents argue the IEP for the 2010–11 school year denied TM a FAPE. They seek reversal of the SRO Decision and reinstatement of the IHO Decision.

■ The IDEA does not require an ideal placement for a student, but rather one that is "likely to produce progress, not regression" and that provides the student with the opportunity for more than "trivial advancement." *Walczak v. Fla. Union Free Sch. Dist.,* 142 F.3d at 130. Thus, the IEP at issue must be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034.

The Second Circuit recently held "that retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered in a *Burlington/Carter* proceeding." *R.E. v. New York City Dep't of Educ.,* 694 F.3d 167, 186 (2d Cir.2012). However, the Court explicitly rejected "a rigid 'four corners' rule prohibiting testimony that goes beyond the face of the IEP. While testimony that materially alters the written plan is not permitted, testimony may be received that explains or justifies the services listed in the IEP." *Id.* (citing *D.S. v. Bayonne Bd. of Educ.,* 602 F.3d 553, 564–65 (3d Cir.2010)).

### A. *Least Restrictive Environment (LRE)*

The IDEA requires that students with disabilities be educated in the least restrictive environment available to them. *See* 20 U.S.C. § 1412(a)(5)(A). The Second Circuit provided a framework for analyzing an LRE challenge in *P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Educ.,* 546 F.3d 111 (2d Cir.2008). Under this two-pronged approach, the Court first determines "(1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students in the class." *Newington,* 546 F.3d at 120 (quoting *Oberti v. Clementon Sch. Dist.,* 995 F.2d 1204, 1215 (3d Cir.1993)). If the district was justified in removing the student from mainstream classes, the Court next considers "whether the school has included the child in school programs with nondisabled children to the maximum extent possible." *Id.*

■ Parents argue the 2010–11 IEP failed the L RE requirement because the CSE recommended TM be placed in a 12:1 + 1 special class during July and August of 2010, when it was aware TM could function successfully in a general education classroom with appropriate support.

The district argues the LRE provisions presume the existence of a "regular education environment." Because the district does not provide summer programs for non-disabled students, there is no available "regular education environment" in which TM could have been placed. Courts in other circuits have held that a district that does not operate a mainstream educational program during the summer months is not obligated to create one simply to satisfy the LRE requirements of the IDEA. *See T.R. v. Kingwood Township Bd. of Educ.,* 205 F.3d 572, 579 (3d Cir.2000) ("a district that does not operate a regular ... program is not required to initiate one simply in order to create an LRE opportunity for

a disabled child," but should assess mainstream classroom options "within a reasonable distance"); *Travis G. v. New Hope–Solebury Sch. Dist.*, 544 F.Supp.2d 435, 443 (E.D.Pa.2008); *Reusch v. Fountain*, 872 F.Supp. 1421, 1438 (D.Md.1994) ("the Court does not read the IDEA to mandate indifference to legitimate practical considerations or interference with other school programming to create artificial LRE settings during the summer months."). Thus, the district argues the SRO properly found the recommended summer placement did not deny TM a FAPE, despite claims that the special summer class was not TM's LRE.

Parents respond that the fact the district does not offer general education classes during the summer does not relieve it of its LRE obligations. Although parents extensively cite *J.G. ex rel. N.G. v. Kiryas Joel Union Free School District*, 777 F.Supp.2d 606, 655 (S.D.N.Y.2011), in support of their argument, that case is distinguishable. In *J.G.*, the court determined the district failed to offer the student an LRE because it did not include him in mainstream school offerings to the maximum extent possible. The issue in that case was not whether or not alternately available, less-restrictive placement options existed, but rather why the district failed to offer the less-restrictive option to the student. 777 F.Supp.2d at 655. Applying the two-prong test set forth in *Newington*, the court in *J.G.* determined that while the student could not be educated in a mainstream classroom, the district failed to include the student with his mainstream peers in any other school program, including non-academic offerings. The court concluded the district's failure to satisfy the second prong of the test was a violation of the LRE requirement. *Id.*

In this case, the CSE did not recommend a restricted class over a less-restrictive placement option. Instead, it offered two ESY placement options for TM: a full-day BOCES program, which parents rejected, or the 12:1 + 1 special class. (Tr. at 135–39.) Parents have not shown that a less-restrictive placement option was available to TM but not offered, nor have they cited any authority that would require the district to create mainstream ESY offerings where none currently exist. Therefore, the SRO properly concluded the district's recommended ESY placement offered the LRE and did not deny TM a FAPE.

B. *Functional Behavior Assessment (FBA) and Behavior Intervention Plan (BIP)*

■ Parents argue the district failed to offer TM a FAPE because it did not conduct an FBA or offer a BIP to address his interfering behaviors. The IDEA requires that, when a student's "behavior impedes the child's learning or that of others," the CSE "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i). New York regulations require the CSE to conduct an FBA for a student "whose behavior impedes his or her learning or that of others." 8 N.Y.C.R.R. § 200.4(b)(1)(v).

The SRO concluded on the basis of the record that TM's interfering behaviors were not of such a frequency or degree that impeded his learning or that of other students, and thus an FBA and BIP were unnecessary. The SRO also concluded any such behaviors could be adequately addressed by redirection and refocusing. (SRO Decision at 24.)

Parents argue the SRO's conclusion is erroneous and contradicted by the testimony of Dr. Nursel Kahya, a district BCBA. Parents argue Dr. Kahya's testimony supports the conclusion that TM's behavioral

profile and interfering behaviors warranted an FBA. (Tr. at 834–39, 966–69.) However, this argument mischaracterizes the testimony. Dr. Kahya did not state TM's interfering behaviors warranted an FBA and BIP. Rather, she testified that if TM returned to the district for the school year, the district's behavior consultant would have observed TM to determine whether he required an FBA and BIP, and develop them if necessary. Dr. Kahya testified in detail how she would have gone about conducting an FBA if TM's behaviors were found to be interfering. (*Id.*)

The SRO's determination that TM did not need an FBA or BIP is supported by the record. For example, the March 3, 2010, ABA Evaluation report indicated TM was "generally not disruptive." (JX 19 at 6.) The May 10, 2010, FBA report noted TM exhibited fidgeting behaviors, but noted it was not disruptive to other students. (JX 11 at 3.) The Report further noted TM's inappropriate vocalizations only became disruptive when he was not provided with prompting and redirection. (*Id.*) The testimony of numerous witnesses also established any inappropriate vocalizations or stereotypical behaviors could be addressed by redirection and refocusing. (Tr. at 484–85, 523, 675, 1106–07.)

Even if the evidence supported a conclusion TM was a student who exhibited disruptive behavior that impeded his learning or that of others, the absence of an FBA alone does not render the IEPs inadequate. The CSE appropriately addressed TM's behaviors by recommending the support of a 1:1 teaching assistant to refocus and redirect him if necessary, a strategy which had been successful with TM in the past. The SRO thus properly concluded the absence of a district FBA and BIP did not deny TM a FAPE.

Parents finally argue the SRO erroneously relied on district testimony that an FBA and BIP would have been developed a month after TM began school in determining that the IEP was adequate. The Second Circuit has explicitly held that an FBA must be conducted in advance of an IEP. *R.E. v. New York City Dep't of Educ.*, 694 F.3d at 190–91. While a district's failure to conduct an FBA is a serious omission, it is not in and of itself a denial of a FAPE. *Id.* The absence of an FBA will not render an IEP procedurally inadequate where, as here, the IEP explicitly considers behavioral strategies to address the interfering behaviors. *See A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d at 172; *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir.2009). However, because the SRO concluded an FBA and BIP were not necessary to begin with, her ultimate determination did not rely on retrospective testimony and should not be disregarded on this basis.

## C. Class Size

■ Parents argue the IEPs for September 2010–June 2011 were inadequate because they recommended placement of TM in a general education classroom of 25 students, with special education supports. Parents argue that class size was too large, and would have overwhelmed TM and prevented him from making meaningful progress. The record shows TM had previously been educated in very small classrooms, and the IHO concluded TM needed to be in a class of 15 students or less. (IHO Decision at 17.) Parents argue it was speculative and arbitrary for the SRO to reverse the IHO on this point.

The district argues the SRO properly determined the CSE's recommendation was appropriate, and that the IHO's focus on the number of students in the class disregarded other aspects of TM's placement that were specifically designed to

address his needs. The IEPs recommended a 1:1 teaching assistant to provide TM with appropriate prompting and redirection, as well as the services of a behavioral consultant, which would have addressed any potential distractions that might result from a larger class size. Furthermore, the record shows that the recommended general education kindergarten class employs a "center-based" model where students rotate around different activity centers in small groups. (Tr. at 385–86.) This class structure would have provided TM the opportunity for small group instruction and peer socialization within the context of a larger class.

The SRO reviewed the evidence in the record and concluded the CSE considered parents' concerns about class size but ultimately determined TM would be adequately supported in the recommended placement based on the information the CSE reviewed and its knowledge of the class functioning. (SRO Decision at 27.) The Court defers to the SRO's well-reasoned opinion that the recommended class size did not result in the denial of a FAPE. (*Id.*)

In light of the evidence and the SRO's thorough and careful determination, which this Court concludes is well-reasoned and supported by the record, the Court further concludes the district offered TM a FAPE for the 2010–11 school year.[7] Because parents have not shown the district's IEP was inappropriate, the Court need not address the appropriateness of parents' unilateral placement of TM at Butterhill or any equitable considerations weighing in parents' favor. *See, e.g., Cerra v. Pawling*

*Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir.2005).

### CONCLUSION

Parents' motion for summary judgment (Doc. # 7) is DENIED. The district's motion for summary judgment (Doc. # 15) is GRANTED. The Court therefore affirms the decision of the SRO and dismisses the complaint.

The Clerk is instructed to terminate these motions.

Because the district has separately moved to "amend or alter a judgment ... and for a stay pending disposition of the motion" (Doc. # 29), which motion is *sub judice*, this case will remain open until said motion is decided, which the Court expects to do in the near future.

SO ORDERED:

---

7. Parents do not argue any further objections to the SRO Decision in their brief, and instead state on page 31 of their memorandum of law that "[t]he balance of the FAPE deprivations are discussed more fully in plaintiffs' post-hearing submission," referring the Court to a post-hearing submission to the IHO. Because those arguments were submitted to the IHO prior to the SRO decision, the Court cannot consider them to be specific objections to the SRO Decision in this appeal.